FILED
COURT OF APPEALS
DIVISION II

2013 SEP 24 AM 9: 23

STATE OF WASHINGTON
BY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42130-5-II |
| Respondent, | |
| v. | |
| AMANDA CHRISTINE KNIGHT, | PUBLISHED OPINION |
| Appellant. | |

HUNT, P.J. — Amanda Christine Knight appeals two convictions for second degree assault against two victims, JS[1] and Charlene Sanders, (Counts III and V) during a home invasion robbery[2]; she also appeals her sentences, arguing that they were based on an incorrect offender score. Knight argues that there was insufficient evidence to support these convictions and that they constitute double jeopardy because (1) the jury instructions were ambiguous, and (2) the assaults should have merged with her first degree robbery convictions committed against the same two victims (Counts IV[3] and II). She also asks us to remand for resentencing because

---

[1] It is appropriate to provide some confidentiality in this case. Accordingly, we use initials to identify the juveniles involved.

[2] Knight does not appeal her first degree felony murder and other convictions arising from this same home invasion.

[3] Knight is correct that the information named Charlene as a victim of both robbery (Count IV) and assault (Count V). But Knight mistakenly asserts that the robbery victim named in Count II (James, who was also the murder victim in Count I) was also the assault victim named in Count III (JS), which neither the information nor the facts support. At oral argument, Knight abandoned this latter argument.

the trial court erred in calculating her offender score when it counted several of the convictions as separate points instead of counting them as one point because they constituted the same criminal conduct under RCW 9.94A.589(1)(a). In her Statement of Additional Grounds (SAG), Knight asserts that the trial court erred in failing to give a nonunanimity jury instruction for the special verdicts that enhanced her sentence. We affirm.

FACTS

I. CRIMES

Amanda Christine Knight, Joshua Reese, and Kyoshi Higashi were acquaintances, who, with another acquaintance, Clabon Berniard, participated in a home invasion robbery in Lake Stevens on April 2010. Soon thereafter, on April 28, Higashi told Knight that he wanted to commit another robbery; Knight drove her car to Renton to pick up Higashi and then picked up Berniard. Higashi had found a Craigslist wedding ring advertisement posted by James Sanders. Using a non-traceable throw-away cell phone, Knight contacted Sanders that morning and asked whether she and her boyfriend could see the ring to buy for Mother's Day. Wanting to arrive after dark, Knight claimed that they were coming from Chehalis and could not be there until that evening.

Knight drove Higashi, Berniard, and Reese to the Sanders' house at 9:00 PM; she drove down the long driveway and backed in to park to facilitate a quick getaway. Higashi was in possession of Knight's firearm; Reese and Berniard were also armed. They had zip ties and masks with them. Before entering, Knight covered up her tattoos and put on a pair of gloves, and Higashi handed her several zip ties. They met James Sanders outside. The three walked together into the Sanders' kitchen.

2

Inside, James[4] handed an old wedding ring to Knight, who handed it to Higashi. When Knight and Higashi asked several questions about the ring, James called upstairs to his wife, Charlene, asking her to come down to help answer the questions. Their two children, JS and CK, remained upstairs. Knight told James she was interested in buying the ring.

Higashi revealed a large amount of cash and asked, "How is this?" He also pulled out a handgun and threatened, "How about this?" 5 Verbatim Report of Proceedings (VRP) at 580. Charlene and James told Higashi and Knight to take whatever they wanted and to leave. Knight zip tied Charlene's hands behind her back; Higashi zip tied James's hands behind his back. Knight removed Charlene's wedding ring from her finger. Knight or Higashi removed James's wedding ring from his finger. Higashi and Knight ordered James and Charlene to lie down on their stomachs on the floor.

Through Knight's Bluetooth headset connection to Reese and Berniard waiting in her car, they heard that the Sanders adults had been secured; and Knight signaled them to enter. Knight knew that Reese and Berniard possessed loaded guns and that using these guns was part of the group's plan to carry out the Sanders' home invasion robbery. Reese and Berniard went upstairs, brought down the two Sanders boys with their hands behind their heads at gunpoint, and forced them to lie down on their stomachs on the floor near the kitchen entryway; Knight walked between them. Charlene and JS saw Knight and Higashi gather up items from the house, including from the downstairs laundry room. Knight also ransacked the main bedroom upstairs, looking for other expensive items to collect.

---

[4] We use James and Charlene Sanders' first names for clarity. We intend no disrespect.

From upstairs, Knight heard the commotion and screams downstairs as her companions assaulted the Sanders family. Berniard held a gun to Charlene's head, pulled back the hammer, began counting down, and asked her, "Where is your safe?" 5 VRP at 586. Charlene responded that they did not own a safe. Berniard kicked Charlene in the head, called her a "b*tch," threatened to kill her and her children. 5 VRP at 586. According to Charlene, "[Berniard] kicked [her] so hard that [her] head went up and then [she] hit down on the ground"; it left a large "goose egg" on her left temple. 5 VRP at 587. Charlene believed she was going to die. Eventually, Charlene told the intruders that they kept a safe in their garage.

While Berniard was forcing James to the garage, James broke free of his zip ties and began beating Berniard. Berniard shot James in the ear, knocking him unconscious. JS jumped on Berniard, who threw JS off and began hitting him with the butt of his firearm. Reese then dragged James's body back through the kitchen and into the adjacent living room, where it was out of sight. Either Reese or Berniard shot James multiple times, causing fatal internal bleeding.

Following the gunshots, the four intruders fled immediately. Charlene went to the living room and found James lying on the floor; his body appeared white, and one of his ears had been shot off. Charlene called 911. The police declared James dead at the scene; autopsy investigators later recovered three bullets from his body. The police also took JS to the hospital, where he was treated for bruising and bleeding around his left ear; the beating left scars that were still visible a year later. In addition to the rings, among the items missing from the Sanders' home were a PlayStation, an iPod, and a cellular phone.

Knight dropped Higashi at a friend's house; Knight and Reese went to a hotel. Later that evening, Higashi called Knight; when they met up, Higashi told Knight and Reese that James

had been killed and that they needed to discard the clothing they had been wearing and to "get rid of" any remaining zip ties. 7 VRP at 922. Knight handed over her clothing.

The following morning, Knight, Reese, and Higashi began driving to California and sold the Sanders' PlayStation and Knight's firearm along the way. California police eventually pulled them over and arrested them on unrelated charges. Knight posted bail, pawned James's wedding band, and purchased a bus ticket to return to Washington. On hearing the news that she was a murder suspect, she turned herself in to the Sumner Police Department.

## II. PROCEDURE

The State charged Knight with (1) first degree felony murder of James (Count I); (2) two counts of first degree robbery,[5][6] against James (Count II) and Charlene (Count IV); (3) two counts of second degree assault,[7] against Charlene (Count V) and JS (Count III); and (4) first degree burglary (Count VI). Each charge alleged accomplice liability and carried a firearm enhancement and other sentencing aggravators for manifest deliberate cruelty, a high degree of

---

[5] The legislature amended RCW 9A.56.190 in 2011. LAWS OF 2011, ch. 336, § 379. The amendments added gender neutral language which did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

[6] The State charged Knight's robbery counts under RCW 9A.56.190, which provides that a person commits robbery "when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person." The corrected second amended information elevated these robberies to first degree under RCW 9A.56.200(1)(a)(i), alleging that Knight, or an accomplice, had been "armed with a deadly weapon." 2 Clerk's Papers (CP) at 305-06.

[7] The State charged Knight's assault counts under RCW 9A.36.021(1), which provides that a person is guilty if he or she "(a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm; or . . . (c) Assaults another with a deadly weapon." The legislature amended RCW 9A.36.021 in 2011. LAWS OF 2011, ch. 166, § 1. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

5

sophistication or planning, and an offender score that would result in some of the current offenses going unpunished.

In its opening statement, the State explained that it would prove the following: (1) Knight and three accomplices, Higashi, Reese, and Berniard, planned to go to the Sanders' house, ostensibly to purchase a ring that James had advertised on Craigslist, "tie everybody up and steal the expensive stuff out of the house . . . ransack the place and take what they could";[8] (2) Knight had later told police that she "wore gloves so she wouldn't leave fingerprints [and] wore long sleeves because she ha[d] rather distinctive tattoos on her arms";[9] (3) once inside the house, Knight zip tied Charlene's hands behind her back, ordered her face down on the kitchen floor, and took Charlene's wedding ring off her hand; (4) Knight then used a Bluetooth to signal the others to enter; (5) later the intruders got the idea that there was a safe in the house, demanded the safe's location, kicked Charlene in the face, and demanded the combination; (6) they also beat Charlene's stepson JS when he tried to intervene to protect his father, James, who was also being beaten before being shot three times; and (6) Knight would claim at trial that she and Reese had been upstairs stealing valuables while JS, Charlene, and James were being beaten downstairs.

The jury instructions provided: (1) To elevate the robbery to first degree, the jury was required to find that, during the commission of the crime, "[Knight] or an accomplice [was] armed with a deadly weapon or inflict[ed] bodily injury." 2 Clerk's Papers (CP) at 339 (Instruction 12); see also CP at 354 (Instruction 26).

---

[8] 5 VRP at 517.

[9] 5 VRP at 528.

(2) "An assault is an intentional touching or striking of another person. . . . An assault is also an act done with the intent to create in another apprehension and fear of bodily injury." 2 CP at 346 (Instruction 18).

(3) "A person commits the crime of [a]ssault in the [s]econd [d]egree when she or an accomplice intentionally assaults another and thereby recklessly inflicts substantial bodily harm or assaults another with a deadly weapon." 2 CP at 347 (Instruction 19).

(4) "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." 2 CP at 334 (Instruction 7).

During closing argument, the State delineated the elements of each crime as set forth in the court's jury instructions and summarized the evidence supporting the elements of each crime. The State specifically argued that it had proved the first degree robbery of Charlene, Count IV, with evidence that Higashi had pointed a gun at Charlene, while Knight zip tied Charlene and took her wedding ring, facts that Knight herself later admitted.[10] The State then argued that it had proven Knight's involvement in the second degree assault of Charlene, Count V, when Berniard put a gun to Charlene's head and started the countdown, during which she was to reveal the safe's location and was kicked in the head.

In her closing argument, Knight expressly admitted her participation in the initial robbery of the Sanders' rings, including that she had "tie[d] up Charlene Sanders and put her down on the floor" to "secur[e] the people" so the four invaders could "go rob the house." 7 VRP at 1036, 1037. Knight claimed, however, that she had done so under duress from Higashi, who had

---

[10] The State also noted that Charlene was kicked and beaten.

coerced her to participate in the Sanders' home invasion, burglary, and robberies. In contrast, Knight clearly distanced herself from Berniard's later "brutal"[11] assaults of JS and Charlene: She argued that she had neither planned nor participated in these two assaults, which she did not even witness.[12]

The jury found Knight guilty on all counts. It returned special verdicts on the firearm enhancements, finding that Knight or an accomplice had been armed during the commission of the crimes. It did not return special verdicts finding Knight had committed the crimes with deliberate cruelty to the victims or with a high degree of sophistication.

At sentencing, Knight moved the court to find that her two assault convictions constituted double jeopardy under the merger doctrine; she also argued that, for sentencing purposes, all of her convictions were based on the same criminal conduct. The trial court denied the motion. Based on an offender score of 10, the trial court imposed high-end standard-sentences on all counts and ran them concurrently; the trial court added firearm enhancements and ran them

---

[11] 7 VRP at 1034.

[12] More specifically Knight argued:
> The [S]tate has said that it's assault with a deadly weapon and causing serious bodily injury, and we know that that's Berniard. Clabon Berniard was absolutely brutal with what he did to Charlene in the kitchen. He kicked her. That's an assault. He put the gun to the top of her head and began a countdown. That's an assault.

7 VRP at 1034. She then went on to argue that she had been in "an entirely different part of the house" and had not been involved in Berniard's assault of Charlene.

No. 42130-5-II

consecutively.[13]

## ANALYSIS

### I. SUFFICIENT EVIDENCE

Knight argues that there was insufficient evidence to support her two second degree assault convictions, against JS (Count III) and Charlene (Count V). We disagree.

#### A. Standard of Review

Evidence is sufficient if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt; evidence is viewed in the light most favorable to the State. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). A defendant claiming that the evidence was insufficient admits the truth of the State's evidence and all reasonable inferences that may be drawn from it. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

#### B. Second Degree Assaults

To prove that Knight was an accomplice to the assaults on Charlene and JS, the State needed to show that she (Knight) knowingly "promote[d]" or "facilitate[d]" the commission of

---

[13] The trial court sentenced Knight as follows: (1) 548 months on Count I (first degree felony murder); (2) 171 months on Count II (first degree robbery of James); (3) 84 months on Count III (second degree assault of JS); (4) 171 months on Count IV (first degree robbery of Charlene); (5) 84 months on Count V (second degree assault of Charlene); and (6) 116 months on Count VI (first degree burglary), to run concurrently. The trial court imposed firearm enhancements of 60 months on Counts I, II, IV, and VI, and 36 months on counts III and V, to run consecutively (apparently to each other) for a total confinement period of 860 months.

9

these crimes (1) by soliciting, commanding, encouraging, or requesting another person to commit the crimes; or (2) by aiding or agreeing to aid another in the planning or committing of the crimes. RCW 9A.08.020(3)(a).[14] A person aids or abets a crime by associating himself with the undertaking, participating in it as in something he desires to bring about, and seeking by his action to make it succeed. *In re Welfare of Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979).

Knight does not dispute that Berniard's kicking Charlene in the head and hitting JS with the butt of his firearm satisfied the elements of second degree assault as to each victim. Instead, she argues that she cannot be culpable as an accomplice to the assaults because they occurred while she was upstairs gathering property in the Sanders' main bedroom. This argument fails: A person's physical presence during the offense is not required for accomplice liability. *See State v. Trujillo*, 112 Wn. App. 390, 398, 408, 49 P.3d 935 (2002) (defendant facilitated commission of murder by knowingly driving the shooters and their weapons to kill rival gang member, despite remaining in van during the shooting).

Knight is correct that "mere presence at the scene" cannot serve as the basis for accomplice liability. Br. of Appellant at 9 (citing *Wilson*, 91 Wn.2d at 491-92). But Knight was more than merely a present, uninvolved observer. The State presented the following evidence from which the jury could reasonably infer that Knight knowingly promoted or facilitated the commission of the assaults: (1) Knight called James to arrange a meeting under the pretense of purchasing a wedding ring advertised for sale; (2) she drove Higashi, Reese, and Berniard to the

---

[14] The legislature amended RCW 9A.08.020 in 2011. LAWS OF 2011, ch. 336, § 351. These amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

Sanders' home; (3) she knew that the plan to obtain the Sanders' ring involved using loaded guns; (4) once inside, she tied Charlene's hands behind her back with zip ties and forced her to the ground; and (5) after Charlene and James were on the ground, Knight used a Bluetooth to signal Reese and Berniard to enter the house, knowing that they were both armed. Each act placed the Sanders in a more vulnerable position and facilitated the commission of the assaults by allowing Knight's accomplices to gain entrance and to avoid resistance. Based on this evidence, we hold that a reasonable jury could infer that Knight promoted or facilitated the commission of these two assaults by aiding another in planning or committing the assaults.

## II. DOUBLE JEOPARDY

For the first time on appeal, Knight argues that her two second degree assault convictions against Charlene and James[15] (Counts V and III) and two first degree robbery convictions, also against Charlene and James (Counts IV and II), constituted double jeopardy. Specifically, she argues that (1) the jury instructions for her second degree assault convictions were ambiguous, and (2) the trial court erred in failing to merge these assault convictions into her robbery convictions.[16] Again, we disagree.

---

[15] In her brief, Knight mistakenly refers to James Sanders as the victim of one of the second degree assault convictions, even though the record shows that JS and Charlene were the only assault victims and James was the murder victim in Count I. But at oral argument, Knight withdrew this argument, conceding that she had mistakenly misstated the counts and victims for this part of her argument. Therefore, we do not further consider it.

[16] The State argues that Knight waived her merger claim. But the record shows that Knight timely raised this issue below, thus preserving this error for our review.

No. 42130-5-II

## A. Failure To Preserve Jury Instruction Challenge

Generally, a party who fails to object to jury instructions below waives any claim of instructional error on appeal. *State v. Edwards*, 171 Wn. App. 379, 387, 294 P.3d 708 (2012). But a defendant does not waive a manifest error affecting a constitutional right by failing to object below. RAP 2.5(a)(3); *State v. Walsh*, 143 Wn.2d 1, 7, 17 P.3d 591 (2001). The initial burden is on Knight to demonstrate that the error is both manifest and is of constitutional dimension. RAP 2.5(a)(3); *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). The determination of whether an error is "manifest" requires an appellant to show "actual prejudice," which we determine by looking at the asserted error to see if it had "practical and identifiable consequences" at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011) (internal quotation marks omitted). *See also State v. Bonds*, 174 Wn. App. 553, 569, 299 P.3d 663 (2013). We narrowly construe exceptions to RAP 2.5(a). *State v. Montgomery*, 163 Wn.2d 577, 595, 183 P.3d 267 (2008).

Our Supreme Court has held that a double jeopardy claim is an error of constitutional magnitude. But Knight fails to make any showing that the alleged ambiguous jury instruction error was manifest because she fails to show any prejudice resulting from the jury instruction that she alleges, for the first time on appeal, was ambiguous. *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011); *State v. Bertrand*, 165 Wn. App. 393, 402, 267 P.3d 511 (2011), *review denied*, 175 Wn.2d 1014 (2012). We hold, therefore, that she has failed to carry her burden to trigger exercise of our limited discretion under RAP 2.5(a)(3) to entertain a non-preserved claim of error; thus, we do not address the merits of her instructional challenge. *Bertrand*, 165 Wn. App. at 402.

No. 42130-5-II

## B. Merger; Double Jeopardy

The state and federal double jeopardy clauses provide the same protections. *In re Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004); *see* U.S. CONST. amend. V; WASH. CONST. art. I, § 9. If a defendant's acts support charges under two statutes, we ask whether the legislature intended to authorize multiple punishments for the crimes in question. *State v. Freeman*, 153 Wn.2d 765, 771, 108 P.3d 753 (2005); *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 536, 167 P.3d 1106 (2007), *cert. denied*, 552 U.S. 1154, 128 S. Ct. 1098, 169 L. Ed. 2d 832 (2008). Double jeopardy principles also bar courts from entering multiple convictions for the same offense. *State v. Womac*, 160 Wn.2d 643, 650-51, 160 P.3d 40 (2007). We consider the elements of the crimes as charged and proved, not merely at the level of an abstract articulation of the elements. *Freeman*, 153 Wn.2d at 777 (citing *State v. Vladovic*, 99 Wn.2d 413, 421, 662 P.2d 853 (1983); *Orange*, 152 Wn.2d at 817-18). Double jeopardy is a question of law, which we review de novo. *Freeman*, 153 Wn.2d at 770.

In *State v. Calle*, our Supreme Court set forth a three-part test for double jeopardy claims. 125 Wn.2d 769, 776, 888 P.2d 155 (1995); *see also State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). First, we search for express or implicit legislative intent to punish the crimes separately; if this intent is clear, we look no further. *Calle*, 125 Wn.2d at 776. Second, if there is no clear statement of legislative intent, we may apply the "same evidence" *Blockburger* test, which asks if the crimes are the same in law and in fact. *Calle*, 125 Wn.2d at 777-78 (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). Third, we may use the merger doctrine to discern legislative intent where the degree of one offense is elevated by conduct constituting a separate offense. *Kier*, 164 Wn.2d at 804 (citing *Vladovic*, 99

13

Wn.2d 419). But even if two convictions appear to merge on an abstract level, the State may punish them separately if each conviction has an independent purpose or effect. *Kier,* 164 Wn.2d at 804; *Freeman,* 153 Wn.2d at 773.

Under the merger doctrine, when a criminal act forbidden under one statute elevates the degree of a crime under another statute, the courts presume that the legislature intended to punish both acts through a single conviction for the greater crime. *Freeman,* 153 Wn.2d at 772-74 (when assault elevates robbery to first degree, generally the two crimes constitute the same offense for double jeopardy purposes). The *Freeman* Court did not, however, adopt a per se rule; instead, it underscored the need for a reviewing court take a "hard look at each case" based on its facts and charged crimes. *Freeman,* 153 Wn.2d at 774.

Knight argues that her convictions for second degree assault and first degree robbery of Charlene (Counts V and IV) should merge.[17] Because the later second degree assault was not necessary to elevate the degree of the earlier robbery, this merger argument fails.[18] *See Freeman,* 153 Wn.2d at 772-73; *State v. Esparza,* 135 Wn. App. 54, 57, 143 P.3d 612 (2006).

---

[17] Because Knight argues that her convictions constitute double jeopardy under only the merger doctrine, we confine our analysis to that issue. RAP 10.3(6).

[18] The instant case differs from *Kier,* in which our Supreme Court held that Kier's first degree robbery and second degree assault convictions merged. *Kier,* 164 Wn.2d at 801-02. Kier was also charged with being armed with or displaying a deadly weapon. Kier pointed a gun at the assault victims, forced them out of their car, and drove their car away. *Id.* at 802-03. The Court concluded that Kier's threatened use of force, a necessary element in both the second degree assault and the first degree robbery as charged and proved, was satisfied by only one act: Kier's being armed with or displaying a gun. *Id.* at 805-06. The Court explained,

> The merger doctrine is triggered when second degree assault with a deadly weapon elevates robbery to the first degree because being armed with or displaying a firearm or deadly weapon to take property through force or fear is *essential* to the elevation.

14

The information alleged that Knight was guilty of robbery under RCW 9A.56.190, which provides that a person commits robbery "when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person." The information elevated this robbery to the first degree[19] by alleging that Knight, or her accomplice, was "armed with a deadly weapon" while taking Charlene's wedding ring. 2 CP at 305. Consistent with the information, the jury instructions specified that to elevate robbery to the first degree, the jury had to find that, *during* the robbery, "[Knight] or an accomplice [was] armed with a deadly weapon *or* inflict[ed] bodily injury." 2 CP at 339 (Instruction 12) (emphasis added); *see also* CP at 354 (Instruction 26). The State charged and produced evidence for only the first alternative, armed with a deadly weapon; and the record shows that this first degree robbery was completed when Higashi threatened Charlene with a firearm and Knight removed Charlene's wedding ring, at which point no one had inflicted bodily injury on Charlene.

---

*Id.* at 806 (emphasis added).

Unlike *Kier*, where the deadly weapon element of the second degree assault conviction *necessarily* elevated the degree of the robbery (because there were no other acts that the jury could have used to enhance the degree of the robbery), here, the State proved the first degree robbery of Charlene and the second degree assault of Charlene based on *separate* criminal acts, separated in time and with separate purposes. As we discussed previously, Higashi's early use of a firearm to steal Charlene's wedding ring from her finger elevated the robbery to first degree, Count IV; the State proved the second degree assault based on Berniard's later kicking Charlene in the head, Count V, in an attempt to get her to divulge the location of the safe. Thus, Knight's second degree assault was *not* essential to the elevating of her robbery conviction to the first degree.

[19] RCW 9A.56.200(1)(a)(i).

The information also alleged that Knight was guilty of second degree assault in that she "intentionally assault[ed] Charlene Sanders, and thereby recklessly inflict[ed] substantial bodily harm, contrary to RCW 9A.36.021(1)(a), *and/or* did intentionally assault Charlene Sanders with a deadly weapon, to wit: a handgun."[20] 2 CP at 307 (emphasis added). The trial court instructed the jury on the first and third common law definitions of "assault"[21]:

> An assault is an intentional touching or striking of another person. . . . An assault is also an act done with the intent to create in another apprehension and fear of bodily injury.

and

> A person commits the crime of [a]ssault in the [s]econd [d]egree when she or an accomplice intentionally assaults another and thereby recklessly inflicts substantial bodily harm or assaults another with a deadly weapon.

2 CP at 346 (Instruction 18), 347 (Instruction 19), respectively. The "to convict" instructions for second degree assault contemplated Knight's or her accomplices' using a handgun as the means of proving second degree assault *or* an unlawful touching or striking, as provided as an alternative means under RCW 9A.36.021(1)(a).

Knight's merger argument would be compelling if the second degree assault of Charlene could have involved *only* Higashi's pointing Knight's gun at Charlene when they robbed Charlene of her wedding ring at the beginning of the home invasion; but such were the not the

---

[20] RCW 9A.36.021(1) provides that a person is guilty if he or she "(a) [i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm; *or* . . . (c) [a]ssaults another with a deadly weapon." (Emphasis added).

[21] In the absence of a statutory definition of "assault," Washington courts use common law definitions, which include: "(1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm." *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009); *see also Kier*, 164 Wn.2d at 806.

facts here. On the contrary, accomplice Berniard's *later* assaults of Charlene (with a different firearm and by kicking her in the head) support the second degree assault conviction, independent of the firearm threat that Knight and Higashi had earlier used to take Charlene's ring during the robbery. Both the State's and Knight's closing arguments support the jury's treatment of Higashi's earlier firearm threat while removing Charlene's wedding ring from her finger as separate from Berniard's later threatening Charlene by pointing a gun at her head to force her to reveal the location of the safe and kicking her in the head. For example, two main points during Knight's closing argument were (1) her open admission that she had participated in the initial robbery of Charlene's ring while Higashi pointed the gun, claiming, however, that the others had forced her to participate in that robbery and the burglary; and (2) she had no prior knowledge of, she had been nowhere near, and she had not in any way participated in Berniard's later brutal assaults of Charlene, JS, and James.

As our Supreme Court admonished in *Freeman* and *Mutch*, when considering double jeopardy, we take a "hard look" at the facts[22] and a "rigorous" review of the "entire trial record."[23] We focus on the crimes as charged and instructed to the jury, the evidence in the case,

---

[22] *Freeman*, 153 Wn.2d at 774.

[23] *Mutch*, 171 Wn.2d at 664.

and the closing arguments.[24] Here, Berniard's pointing his gun at Charlene and kicking her in the head to force her to reveal the location of a safe provided an "independent purpose" and support for a separate conviction for this later second degree assault, independent of Knight's and Higashi's earlier completed robbery of Charlene's ring at gunpoint. *See Freeman*, 153 Wn.2d at 778-79 ("independent purpose or effect" exception is "less focused on abstract legislative intent and more focused on the facts of the individual case"); *State v. Prater*, 30 Wn. App. 512, 516, 635 P.2d 1104 (1981) (separate injury and intent justified separate assault conviction where defendant struck victim *after* completing a robbery). Berniard's later assault of Charlene to locate the family safe "was no part of the robbery"[25] of her wedding ring by Knight and Higashi earlier.

We hold, therefore, that under the facts here, (1) the second degree assault (Count V) and the first degree robbery (Count IV) do not merge; and (2) proof that Knight and/or her accomplices committed the crime of second degree assault was not necessary to elevate the robbery to first degree. *Esparza*, 135 Wn. App. at 66 (citing *Freeman*, 153 Wn.2d at 777-78).

---

[24] As the Supreme Court explained in *Mutch*:

> While the court may look to the entire trial record when considering a double jeopardy claim, we note that our review is rigorous and is among the strictest. Considering the evidence, arguments, and instructions, if it is not clear that it was *"manifestly apparent* to the jury that the State [was] not seeking to impose multiple punishments for the same offense" and that each count was based on a separate act, there is a double jeopardy violation.

*Mutch*, 171 Wn.2d at 664 (alteration in original) (quoting *State v. Berg*, 147 Wn. App. 923, 931, 198 P.3d 529 (2008)).

[25] *Prater*, 30 Wn. App. at 516.

III. EFFECTIVE ASSISTANCE OF COUNSEL

Knight next argues that she received ineffective assistance when her trial counsel allegedly failed to inform the trial court that it could impose an exceptional sentence downward. Knight's argument fails.

A. Standard of Review

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) her counsel's representation was deficient, falling below an objective standard of reasonableness; and (2) the deficient performance prejudiced her. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009) (citing *State v. McFarland*, 127 Wn.2d 322, 334–35, 899 P.2d 1251 (1995) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984))). A petitioner's failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996)[26].

A standard range sentence is generally not appealable. RCW 9.94A.585(1). Nevertheless, a defendant may appeal the trial court's procedure in imposing his sentence. *State v. Ammons*, 105 Wn.2d 175, 183, 713 P.2d 719, 718 P.2d 796 (1986). Here, Knight encompasses her sentencing challenge within an ineffective assistance of counsel claim.

---

[26] *Overruled on other grounds by Carey v. Musladin*, 549 U.S. 79, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

## B. No Prejudice Shown

Even assuming, without deciding, that the trial court could have imposed an exceptional sentence downward under former RCW 9.94A.535 (2008)[27], we hold that (1) Knight fails to show that her counsel's failure to inform the court of this possibility prejudiced her,[28] and (2) her reliance on *State v. McGill*[29] is misplaced.[30] The trial court in *McGill* "erroneously believed it could not depart from a standard range sentence even though it expressed a desire to do so." *McGill*, 112 Wn. App. at 97. Here, in contrast with *McGill*, there is no indication that the trial court would have considered or imposed even a low end standard sentence, let alone an exceptional sentence downward.[31] Instead, the trial court's imposition of a *high-end* standard-range sentence expressed quite the opposite. Knight has failed to show that her counsel's failure

---

[27] The legislature has since amended this statute in 2013. LAWS OF 2013, ch. 256 § 2. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

[28] We agree with the State that defense counsel has no obligation to advocate for an exceptional sentence below the standard range in general, much less in every case.

[29] *State v. McGill*, 112 Wn. App. 95, 47 P.3d 173 (2002).

[30] A jury convicted McGill of three cocaine-delivery crimes. *McGill*, 112 Wn. App. at 98. The trial court imposed a low end standard sentence, stating it had "no option but to sentence [McGill] within the range." McGill's counsel failed to inform the trial court that there were other permissible bases for imposing an exceptional sentence downward. *McGill*, 112 Wn. App. at 97. On appeal, Division One held that McGill received ineffective assistance because the trial court's comments indicated that it *would have* considered an exceptional sentence had it known it could. *McGill*, 112 Wn. App. at 100-01.

[31] Moreover, there is nothing in the record to suggest that the court relied on an impermissible basis for refusing to impose an exceptional sentence, as was the case in *McGill*. *McGill*, 112 Wn. App. at 100 (citing *State v. Garcia-Martinez*, 88 Wn. App. 322, 329, 944 P.2d 1104 (1997), *review denied*, 136 Wn.2d 1002 (1998)).

to inform the court of the possibility of an exceptional sentence downward prejudiced her. Accordingly, her ineffective assistance of counsel challenge fails.

## IV. OFFENDER SCORE

Finally, Knight argues that the trial court erred in calculating her offender score because several of her current convictions were based on the "same criminal conduct" under RCW 9.94A.589(1)(a). We disagree.

### A. Standard of Review

Where two or more offenses encompass the same criminal conduct, the sentencing court counts them as a single crime when calculating the defendant's offender score. RCW 9.94A.589(1)(a). "Same criminal conduct" for offender score calculation purposes means "two or more crimes" that (1) require the "same criminal intent," (2) were committed at the "same time and place," and (3) involved the "same victim." RCW 9.94A.589(1)(a). If any one of these elements is missing, the sentencing court must count the offenses separately in calculating the offender score. *State v. Maxfield*, 125 Wn.2d 378, 402, 886 P.2d 123 (1994); *see also State v. Dunaway*, 109 Wn.2d 207, 216, 743 P.2d 1237, 749 P.2d 160 (1988). But absent an abuse of discretion or misapplication of the law, we may not reverse a trial court's determination of what constitutes the same criminal conduct for offender score calculation purposes. *State v. Tili*, 139 Wn.2d 107, 122, 985 P.2d 365 (1999).

### B. Crimes Not Based on Same Criminal Conduct

Knight argues that the trial court erred in failing to treat the following pairs of crimes as the "same criminal conduct" for offender score purposes because they occurred at the same time and place and her "objective intent throughout the incident never changed from completing the

21

robbery"[32]: (1) first degree robbery and felony murder of James (Counts II and I), and (2) first degree robbery and second degree assault of Charlene (Counts IV and V).[33] She also argues that first degree burglary should have counted as the same criminal conduct as her other crimes because it, too, occurred at the same time and place and her "objective intent throughout the incident never changed." Br. of Appellant at 31. At sentencing, the trial court rejected Knight's same criminal conduct argument, stating:

> [T]he robbery, that is, of the ring, was completed before the assaults and the murder occurred. Therefore, although they occurred in the same place, Counts I and II and IV and V do *not occur at the same time*. The robbery of James Sanders was completed, as well as the robbery of Charlene Sanders, at the time their rings were stolen. And therefore, the murder and the assaults would not be the same criminal conduct because of that.
>
> In addition, we have a different person involved in the assaults, which is Clabon Berniard, and therefore, it's a completely separate criminal act for that purpose.

8 VRP at 1090 (emphasis added). We adopt the trial court's rationale as it pertains to our offender score analysis here.

---

[32] Br. of Appellant at 31. Knight further argues that (1) she was upstairs when her accomplices committed the violent acts against Charlene and JS; (2) she had been unarmed during the earlier robbery of the Sanders' wedding rings; and (3) she never physically harmed any of the victims. This argument, however, has no bearing on the same criminal conduct/offender score issue. As the trial court properly instructed the jury, it could convict Knight based on her accomplice liability for all counts charged; and as we have already explained, the State's evidence supported her convictions as an accomplice. Because she was culpable for the acts and intentions of her accomplices, her contention that she personally did not intend their criminal acts does not support her "same criminal conduct" offender score argument. *See State v. McDonald*, 138 Wn.2d 680, 688, 981 P.2d 443 (1999) (an accomplice and principal are equally culpable regardless of which one actually commits the criminal act or the degree of participation of each).

[33] As Knight correctly concedes, "[C]rimes against separate victims could not constitute the same criminal conduct." Br. of Appellant at 31.

22

### 1. Robbery and murder of James

Our Supreme Court has previously addressed and rejected the notion that robbery and murder share the same criminal intent for "same criminal conduct" offender score purposes, holding, "When viewed objectively, . . . the intent behind robbery is to acquire property while the intent behind attempted murder is to kill someone."[34] *Dunaway*, 109 Wn.2d at 216. In addition, here, James's later murder did not further the commission of either earlier robbery because both robberies were completed once Knight's accomplice took James's and Charlene's wedding rings, well before Berniard's later assault of Charlene and before Berniard and Reese brought the children downstairs. Thus, Knight fails to show that the trial court abused its discretion in concluding that the murder and robbery of James did not occur at the "same time." RCW 9.94A.589(1)(a).

---

[34] Our Supreme Court expressly noted in *Dunaway*:

> Green and Franklin each committed armed robbery and then each attempted to murder his victim. The murders were attempted after receiving the money but before leaving the premises. When viewed objectively, the criminal intent in these cases was substantially different: [T]he intent behind robbery is to acquire property while the intent behind attempted murder is to kill someone. RCW 9A.56.190; RCW 9A.32.030. The defendants have argued that the intent behind the crimes was the same in that the murders were attempted in order to avoid being caught for committing the robberies. However, this argument focuses on the subjective intent of the defendants, while the cases make clear that the test is an objective one. *State v. Huff*, 45 Wn. App. 474, 478-79, 726 P.2d 41 (1986); *State v. Edwards*, 45 Wn. App. 378, 382, 725 P.2d 442 (1986); *State v. Calloway*, 42 Wn. App. 420, 424, 711 P.2d 382 (1985). Additionally, neither crime furthered the commission of the other. While the attempted murders may have been committed in an effort to escape the consequences of the robberies, they in no way furthered the ultimate goal of the robberies. Clearly, the robberies did not further the attempted murders. Accordingly, we hold that these crimes did not encompass the same criminal conduct.

*Dunaway*, 109 Wn.2d at 216-17.

## 2. Robbery and assault of Charlene

In our evidence sufficiency analysis, we held that Knight was an accomplice to the assault on Charlene based on Berniard's kicking Charlene in the head. We rejected her argument that, because this assault occurred while Knight was upstairs gathering property in the Sanders' main bedroom, she could not be culpable as an accomplice. The robbery of Charlene was complete once Knight removed the ring from Charlene's finger while Higashi held the firearm. This later assault—Berniard's kicking Charlene in the head in an attempt to get the safe—does not constitute the same criminal conduct as the earlier robbery because, as the trial court similarly concluded, these two crimes did not occur at the same time. Thus, they could not count as the same criminal conduct for offender score purposes under RCW 9.94A.589(1)(a).

## 3. Burglary anti-merger statute

Knight's final argument—that the burglary constituted the same criminal conduct as all of her other convictions—ignores the trial court's independent legislative authority to punish the burglary separately under the burglary anti-merger statute:

> Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor[e] as well as for the burglary, and may be prosecuted for each crime separately.

RCW 9A.52.050. This statute gives a trial judge discretion to punish a burglary separately, even where the burglary and another crime encompassed the same criminal conduct. *State v. Lessley*, 118 Wn.2d 773, 781-82, 827 P.2d 996 (1992). The trial court here had authority under RCW 9A.52.050 to impose a separate sentence for Knight's burglary conviction, regardless of whether the burglary constituted the same criminal conduct as any of her other convictions.

24

No. 42130-5-II

We hold that Knight fails to show that the trial court abused its discretion in denying her request to treat any of her convictions as the same criminal conduct for offender score calculation purposes under RCW 9.94A.589(1)(a).

V. REMAINING SAG ISSUE: SPECIAL VERDICT UNANIMITY

In her SAG, Knight asserts for the first time that her sentence violated her right to a jury trial under the Washington Constitution, article 1, section 21, because the jury was not properly instructed it could vote "no" on the special verdict forms for her firearm enhancements. SAG at 1. She is incorrect.

Knight fails to show how this alleged jury instruction error prejudiced her or that it was manifest for purposes of the RAP 2.5(a)(3) exception to the preservation requirement. *Mutch*, 171 Wn.2d at 656; *Bertrand*, 165 Wn. App. at 402 (special verdict jury instruction incorrectly stating that jury must unanimously answer "no" is not of constitutional magnitude); *State v. Grimes*, 165 Wn. App. 172, 182-84, 267 P.3d 454 (2011), *review denied*, 175 Wn.2d 1010 (2012). Thus, she cannot raise this challenge for the first time on appeal, and we do not further

25

No. 42130-5-II

address it.[35] RAP 2.5(a)(3); *Bertrand*, 165 Wn. App. at 402.[36]

We affirm.

_____
Hunt, P.J.

We concur:

_____
Penoyar, J.

_____
Bjorgen, J.

---

[35] Even were we to consider the merits of Knight's challenge to the special verdict instructions, the trial court here gave the proper instruction, as follows:

> You will also be given special verdict forms for the [charged crimes]. If you find the defendant not guilty of any of these crimes, do not use the special verdict forms for that count. If you find the defendant guilty of any of these crimes, you will then use the special verdict forms. In order to answer the special verdict forms "yes," all twelve of you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you do not unanimously agree that the answer is "yes" then the presiding juror should sign the section of the special verdict form indicating that the answer has been intentionally left blank.

2 CP at 365 (Instruction 35). Thus, contrary to Knight's assertion, the jury instruction properly informed the jury that (1) it should sign the special verdict forms only if it was unanimously satisfied that the answer was "yes"; and (2) if it was *not* unanimous, it should leave the form blank. This instruction comports with the instruction approved by our Supreme Court in *State v. Nunez*, 174 Wn.2d 707, 710, 719, 285 P.3d 21 (2012).

[36] *See also O'Hara*, 167 Wn.2d at 98 (manifest constitutional errors "may still be subject to a harmless error analysis").