# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59160-0-II |
| Respondent, | |
| v. | |
| DANIEL SILVA, aka DAVID SILVA, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—Silva was convicted of first degree unlawful possession of a firearm and fourth degree assault. As part of his judgment and sentence, the court imposed a no-contact order between Silva and AR. Silva appeals his convictions and the no-contact order. Silva argues that the trial court erred by not independently addressing any bias arising from the jurors' concern that Silva was recording them, and by imposing a 10-year no-contact order as a crime-related prohibition where there is no nexus between Silva's unlawful possession of a firearm conviction and his conviction for assaulting AR. Silva also claims ineffective assistance of counsel.

We conclude that Silva's claim that the trial court erred in not sua sponte questioning the jury about Silva's trial misconduct and issuing a curative instruction was waived. And even if the claim was not waived, the trial court fulfilled its duty by discussing the issue with counsel. We also conclude that Silva did not receive ineffective assistance of counsel based on counsel's decision not to seek a remedy related to Silva's misconduct. We further conclude that the trial

court did not err by imposing a 10-year no-contact order as a crime-related prohibition, but lacked the authority to impose a domestic violence no-contact order longer than 5 years. Accordingly, we affirm Silva's convictions, but remand to the trial court to reduce the length of the domestic violence no-contact order.

FACTS

I. BACKGROUND INCIDENT

In May 2022, the police were called to a residence where Silva and his then-girlfriend, AR, lived together. AR had called 911 to report a domestic violence incident. When the deputies arrived, AR came out from hiding and kept looking around. AR told the deputies that she had been assaulted and showed the deputies injuries to her eye, marks on her body, and a cut on her knee. AR kept trying to walk away from the deputies and said she was afraid to be seen talking to them. Deputy Oleole invited AR to sit in the back of his car, where he assured her that she could not be seen by Silva. Later, AR completed a written statement. In the statement, which was given under the penalty of perjury, AR stated that Silva " '[b]lacked my eye and beat me with a [flashlight].' " 4 Verbatim Rep. of Proc. (VRP) at 434.

Based on AR's report and visible injuries, Deputy Oleole determined he had probable cause to arrest Silva. The deputies went to AR and Silva's residence and, after speaking with Silva, arrested him. Deputy Oleole asked if Silva wanted to go inside and get shoes or go to the jail barefoot. Silva was initially reluctant, but agreed to go inside with the deputies to retrieve a pair of shoes. Silva hesitated three times as the deputies followed him from the living room to the bedroom. As Silva was putting on slippers near his bed, he backed up toward the window with his hands up like he was reaching for something. Deputy Oleole noticed a gun, in plain view, on the

2

windowsill and notified Deputy Oake. The deputies removed Silva from the room and brought him to Deputy Oake's patrol vehicle. After Silva was transported to the jail, Deputy Oleole retrieved the firearm from the residence, accompanied by AR.

The State charged Silva with fourth degree assault – domestic violence and first degree unlawful possession of a firearm. The matter proceeded to a jury trial.

## II. TRIAL

At trial, the State presented testimony from both Deputy Oake and Deputy Oleole. The trial court admitted the videos from the deputies' body worn cameras, with audio. The videos depicted the events set forth above.

During the State's direct examination of Deputy Oake, Oake testified that Silva hesitated several times throughout his interaction with the deputies, in the living room, in the hall, and in the bedroom. In response to a question from the State about "potential danger signs" he is trained to look for, Oake testified that one of those signs is the "felony stare." 2 VRP at 268. He explained "If somebody stops and is just kind of staring and thinking, it's most likely -- it could be that they are calculating to do something, either flee or harm or something like that." *Id.* Deputy Oake went on to say that Silva hesitated three times on the way from the living room to the bedroom where the firearm was located. Silva did not object to this testimony. During cross examination of Deputy Oake, defense counsel attempted to recharacterize Silva's hesitation. Defense counsel elicited testimony that Silva initially did not want the officers to enter his home with him and that during the times when Silva was hesitating, he was talking to the deputies, and kept asking why he was being arrested.

The State rested its case without calling AR as a witness. AR testified for Silva. AR testified that she lied in the written statement she provided to law enforcement. She testified that she obtained her injuries during a camping trip with friends in which she went river rafting, had bonfires, and shot her friend's firearm. AR further testified that in the hurry to pack their belongings after the camping trip, her friend's firearm ended up in her bag and she only discovered it while unpacking at the residence she shared with Silva. As to why she called 911 on the date of the incident, AR testified that she discovered Silva was cheating on her and became very angry. She testified that she called 911 in an effort to have Silva arrested. During AR's testimony, the trial court admitted her written statement. AR claimed that she lied in her written statement because she wanted to hurt Silva.

Defense counsel discussed AR's favorable testimony at length during closing argument, arguing to the jury that it was more reasonable to believe the story AR testified to at trial, then the one she told the deputies the day of the incident. During closing argument, Silva wrote the words "not guilty" on a notebook and displayed it to the jury. At the State's request, the court admonished Silva and instructed the jury "to disregard any communications that you have seen from the defendant or from counsel's area on that side." 4 VRP at 517.

The court instructed the jury to decide "solely upon the evidence presented during these proceedings" and not to consider evidence other than "the testimony that you have heard from witnesses and the exhibits [the court has] admitted, during trial" Clerk's Papers (CP) at 41. Similarly, the court instructed the jurors not to "let your emotions overcome your rational thought process" and to reach a decision "based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference." *Id.* at 43.

At the start of jury deliberations, several jurors expressed concern that Silva was videotaping the jurors during trial based on the position of his phone. The trial court alerted both attorneys to this issue and sought input on how to deal with it. At the State's suggestion, the trial court asked defense counsel to examine Silva's phone and determine whether Silva had videotaped or photographed the jury during trial. Silva agreed to this and defense counsel completed an examination of Silva's phone and reported that no recording or photographing had taken place. As a result, Silva did not seek any remedy or ask the trial court to take any further action.

The jury found Silva guilty of both first degree unlawful possession of a firearm and fourth degree assault - domestic violence.

### III. SENTENCING

As it relates to Silva's sentence on the unlawful possession of a firearm conviction, the judgment and sentence set forth a condition of the sentence that Silva not have contact with AR for a period of 10 years, which is the statutory maximum period for that offense. The judgment and sentence for the assault in the fourth degree - domestic violence conviction did not contain a no-contact provision. The trial court also entered a separate, standalone domestic violence no-contact order pursuant to ch. 10.99 RCW, but the order is not clear about whether it pertains to the assault in the fourth degree conviction or the unlawful possession of a firearm conviction. The duration of the order is 10 years.

### DISCUSSION

### I. RIGHT TO AN IMPARTIAL JURY

Silva argues that his right to an impartial jury was violated because the trial court failed to sua sponte address potential prejudice arising from jurors' concerns that Silva may have been

recording them with his cell phone throughout trial. The State contends that this issue was not preserved below and, even if it was, the trial court acted within its discretion when, at the recommendation of counsel, it took no remedial action. We conclude that Silva's claim is barred because Silva waived any error.

A. Legal Principles

Criminal defendants have a federal and state constitutional right to a fair and impartial jury. *State v. Irby*, 187 Wn. App. 183, 192, 347 P.3d 1103 (2015). "RCW 2.36.110 and Cr R 6.5 place a 'continuous obligation' on the trial court to investigate allegations of juror unfitness and to excuse jurors who are found to be unfit, even if they are already deliberating." *State v. Elmore*, 155 Wn.2d 758, 773, 123 P.3d 72 (2005). RCW 2.36.110 requires a judge to excuse any juror who, in the judge's opinion, "has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." A trial court's decision of whether to sua sponte dismiss a juror under RCW 2.36.110 is reviewed for abuse of discretion. *State v. Lawler*, 194 Wn. App. 275, 282, 374 P.3d 278 (2016).

We will generally refuse to review a claim of error that was not raised at the trial court. RAP 2.5(a). However, a party may raise a manifest error affecting a constitutional right for the first time on appeal. RAP 2.5(a). Assuming a claimed error is of constitutional magnitude, the appellant must further show the error is "manifest." *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). Error is manifest under RAP 2.5(a) if the appellant can show actual prejudice, demonstrated by a " 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.' " *Id.* (alteration in original) (internal quotation

marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). The defendant bears the burden of demonstrating that the alleged error is both manifest and of constitutional magnitude. *State v. Knight*, 176 Wn. App. 936, 950-51, 309 P.3d 776 (2013). Moreover, even when an issue *was* raised below, principles of waiver may still be applied "if the issue is deliberately not litigated during trial." *State v. Hayes*, 165 Wn. App. 507, 515, 265 P.3d 982 (2011).

B. Application

Silva presents no argument in his opening brief for why this court should review this unpreserved claim of error. And even if Silva demonstrated manifest error affecting a constitutional right, Silva waived this claim of error through defense counsel's knowing, reasoned rejection of the opportunity to request that the trial court issue a curative instruction or poll the jury. To the extent that the doctrine of waiver is inapplicable to the trial court's independent duty to protect a defendant's right to a fair trial, the trial court fulfilled this duty by discussing the issue with counsel and giving counsel the opportunity to request a curative instruction or ask to poll individual jurors. When the jurors' concerns came to the trial court's attention, the court asked counsel to recommend a course of action. Defense counsel agreed, with Silva's permission, to examine Silva's phone to determine whether Silva had taken any photos or videos of the jury. After confirming that Silva had not taken any photos or videos of the jury, the court asked whether any additional action was needed to address the issue. Silva's counsel responded that no action was needed. The trial court must be careful not to interfere with a defendant's strategic decisions regarding the selection of a jury. *Lawler*, 194 Wn. App. at 289-90. Here, because counsel did not request that any inquiry be made of the jurors, the trial court may have concluded that defense

counsel made a strategic decision not to interfere with the jury it had carefully selected. The trial court did not abuse its discretion in not pursuing this matter further after defense counsel had expressly rejected the need to do so.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Silva argues that he received ineffective assistance of counsel because (1) counsel did not ask the trial court to address jurors' concerns that Silva was recording them during trial and (2) counsel did not object to Deputy Oake's testimony regarding the so-called "felony stare." We disagree.

A. Legal Principles

The right to counsel includes the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To prevail on a claim of ineffective assistance of counsel, a defendant must show "(1) that defense counsel's conduct was deficient, . . . and (2) that the deficient performance resulted in prejudice." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). We need not address both prongs of the test when the defendant's showing on one prong is insufficient. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

Performance is deficient if it falls below an objective standard of reasonableness based on the record established at trial. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption that counsel performed reasonably, but this presumption can be overcome when " 'there is no conceivable legitimate tactic explaining counsel's performance.' " *Grier*, 171 Wn.2d at 33 (quoting *Reichenbach*, 153 Wn.2d at 130). Decisions on whether and when to object are "classic example[s] of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). "Only in egregious circumstances, on testimony central to the State's case, will

the failure to object constitute incompetence of counsel justifying reversal." *Id.* To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Grier*, 171 Wn.2d at 34 (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

B. Application

Silva first argues that his counsel was ineffective because counsel did not ask the court to address jurors' concerns that Silva was recording them. However, Defense counsel's tactical decision not to seek a remedy or ask the trial court to take any further action once it was determined that no recording or photographing had taken place was reasonable. Defense counsel may have reasonably felt that it was best not to draw more attention to the jurors' concerns during deliberations. And, as the State notes, there was a significant risk that in pursuing a remedy, a mistrial may have been declared and Silva may have the lost the benefit of AR's highly favorable testimony. It would have been reasonable for defense counsel to prefer to avoid this possibility. Finally, Silva has not shown, in light of the significant evidence presented by the State, that the outcome of the trial would probably have been different had one or more jurors been replaced by alternate jurors. Because Silva has not shown either deficient performance or prejudice on this point, his claim fails.

Silva also argues that his counsel was ineffective by failing to object to Deputy Oake's testimony regarding the so-called "felony stare." Assuming, without deciding, that counsel performed deficiently in failing to object to this testimony, Silva does not demonstrate a reasonable

probability that the outcome of the trial would have been different absent Deputy Oake's single mention of the "felony stare." Ultimately, this evidence pertained to the deputy's assertion that Silva hesitated, which in turn supported the inference that he knew that there was a gun in the bedroom. But Silva does not challenge the sufficiency of the evidence proving his knowledge of the gun. Rather, he focuses on the testimony's lack of relevance under the evidence rules, and the inflammatory nature of the language because it implied that Silva was a "cunning criminal." Br. of Appellant at 38. While we agree that this language is needlessly provocative, Silva's actions strongly supported an inference that he knew the gun was in the bedroom and was trying to avoid the deputies finding it. Furthermore, Deputy Oake testified that Silva reached his hands in the direction of the windowsill where the gun was located. There is not a reasonable probability that the outcome of the trial would have been different absent Deputy Oake's use of the term "felony stare." Thus, Silva's ineffective assistance of counsel claim fails.

### III. NO-CONTACT ORDER

As we note above, the trial court imposed two no-contact orders in this case. The first was imposed as a condition of Silva's sentence for unlawful possession of a firearm. The second was a standalone domestic violence no-contact order pursuant to ch. 10.99 RCW, which by its terms subjects Silva to arrest. Silva appears to challenge only the no-contact provision contained in the judgment and sentence because he focuses his argument on whether the condition is crime related. Specifically, he contends there is no nexus between Silva's possession of the gun and his assault on AR. But Silva also mentions that under RCW 10.99.050(2)(c), a sentencing court may impose only a five year no-contact order for a gross misdemeanor in which domestic violence is pled and proven. Silva makes no further mention of this order.

Accordingly, it is not clear which of the two no-contact provisions Silva challenges, or whether he is challenging both on distinct grounds. We address both below.

A. Legal Principles

"We review the imposition of crime-related prohibitions for an abuse of discretion." *State v. Ancira*, 107 Wn. App. 650, 653, 27 P.3d 1246 (2001). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *Id.* Under RCW 9.94A.505(9), a trial court may impose a no-contact order for the maximum term of a conviction as a crime-related prohibition. *See State v. Navarro*, 188 Wn. App. 550, 556, 354 P.3d 22 (2015) (interpreting former RCW 9.94A.505(8) (2010) which is now the first sentence of (9)). A crime-related prohibition is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). However, "[n]o-contact orders are not limited to the victims of the crime." *Navarro*, 188 Wn. App. at 556. Witnesses who provide testimony in a criminal case can also be protected by a no-contact provision because their testimony is directly connected to the circumstances of the crime. *Id.* at 557.

B. Application

As it relates to Silva's apparent challenge to the no-contact provision that was imposed as a condition of his sentence for unlawful possession of a firearm, he asserts that this provision is not crime related. The State responds that AR provided testimony related to the unlawful possession of a firearm charge and, thus, the no-contact provision is authorized by law. We agree. AR testified that she was the one who mistakenly brought the firearm into the residence she shared with Silva. She also testified that the gun belonged to her friend. Therefore, as a witness to the

unlawful possession of a firearm charge, AR is directly connected to the circumstances of the crime and the no-contact order was an authorized crime-related prohibition.

Regarding the standalone no-contact order under ch. 10.99 RCW, the State concedes that the maximum allowable duration of the order is 5 years, not 10 years, and asks us to remand this matter to the trial court to reduce the duration of the order. We accept the State's concession.

Accordingly, we affirm the no-contact sentencing provision contained in Silva's judgment and sentence for unlawful possession of a firearm, but we remand the ch. 10.99 RCW no-contact order to the trial court to reduce the duration of the order to no more than five years.

CONCLUSION

We affirm Silva's convictions, but remand this matter to the trial court to correct the term of Silva's ch 10.99 RCW no-contact order to a period no longer than five years.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
CRUSER, C.J.

We concur:

_____
GLASGOW, J.

_____
CHE, J.

12