IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31572-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER ALBERT STOKER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Christopher Stoker contends insufficient evidence supports his

conviction for second degree assault, his counsel deprived him of effective assistance

when calling a witness to testify, the trial court erred when instructing the jury on first

degree burglary, and his judgment and sentence contains a scrivener's error. We affirm

Stoker's conviction, but remand for the sentencing court to correct the scrivener's error.

## FACTS

The facts almost require a scorecard to keep track of a host of men and one woman

involved: Kelley Tate, James Sprayberry, Willie Sprayberry, Justin Paz, Christopher

Stoker, Christopher Eakle, and Shanteek Pruitt. The accused and his accomplices are

Christopher Stoker, Christopher Eakle, James Sprayberry, and Shanteek Pruitt. The

victims are Kelley Tate, Willie Sprayberry, and Justin Paz. Some, if not most, individuals are gang members.

Kelley Tate permitted brothers James and Willie Sprayberry to occupy Tate's Spokane residence. Willie is deaf. After 6 months, James went to jail for 60 days for violating the conditions of his parole. While James Sprayberry resided in jail, Tate rented James' room to Justin Paz. The two grew marijuana together.

When James Sprayberry left prison, he sought to reclaim his former room that Justin Paz occupied. In an effort to do so, James once strode through the home's front door with a shotgun and two women at his side. After a brief struggle, Kelley Tate grabbed the shotgun from James and ordered him to leave. An embarrassed James left the home.

One month later, on November 18, 2011, James Sprayberry, Christopher Eakle, and Christopher Stoker went to Shanteek Pruitt's home for a party. Pruitt is a member of the Crips gang. Members from a rival gang, the Bloods, appeared at her party. Because Pruitt worried there may be a fight, Stoker lent her his knife.

Around 2:00 a.m. on November 19, 2011, James Sprayberry, Christopher Eakle, Shanteek Pruitt, and Christopher Stoker left Pruitt's house party to purchase marijuana. James drove them to Kelley Tate's home. Stoker, Eakle, and Pruitt exited the car and knocked on the home's door. There was no response. Stoker, who had been to the home before, knew that people often entered and exited through the back door. So, Stoker,

2

Eakle, and Pruitt walked around the house. But instead of passing through the back door, the trio entered the basement window. According to Christopher Stoker, he was good friends with Willie Sprayberry and he often entered homes, in which Willie lived, through windows.

Once inside the Tate home, Christopher Stoker awoke Willie Sprayberry and told him his brother James sent them to buy marijuana. Willie led the three upstairs, and he went directly into the bathroom, shutting the door behind him.

Christopher Stoker testified he saw a light shining in Kelley Tate's room, so he went to Tate's doorway, apologized for the later hour, and asked to buy a quarter ounce of marijuana. Tate appeared upset that Stoker brought two people to his house whom he did not know. While Stoker talked to Tate, he heard Christopher Eakle and Shanteek Pruitt arguing with someone. When Stoker turned around, he saw Pruitt and Eakle in another bedroom, going through a wallet. Stoker asked the pair, "What are you doing, What are you doing?" Report of Proceedings (RP) at 619. Stoker instructed them to return the money, and he pulled Eakle out of the bedroom by the back of his sweater. Stoker then noticed for the first time that Christopher Eakle had a gun.

Kelley Tate's version of the story differs. He heard the bathroom door slam, he looked towards the door, and he saw Christopher Stoker, who he never saw before. Christopher Eakle, who Tate also did not know, said, "you know what this is," and Shanteek Pruitt and Eakle, respectively brandishing a knife and a gun, ransacked Tate's

3

room looking for money. RP at 31. Tate concluded that James Sprayberry conceived the theft to retaliate for the previous embarrassment and to steal rent money.

According to Kelley Tate, while Christopher Eakle and Shanteek Pruitt ransacked Tate's room, Christopher Stoker kept watch outside the room. Stoker wore brass knuckles and gloves.

Unable to find any money in Kelley Tate's room, the trio of thieves roamed the house, opened doors, and looked for others. Justin Paz woke up with a pistol to the back of his head and Christopher Eakle telling him to be "cool." RP at 182. Shanteek Pruitt then rifled through Paz's possessions. According to Christopher Stoker, he asked Pruitt what she was doing and told her "to not grab anything." RP at 186. Pruitt did not heed Stoker's direction. Instead, she grabbed Paz's wallet and took $160 dollars from it. Meanwhile, Eakle threatened to kill Paz for his Sureño tattoo. Such a tattoo symbolizes allegiance to southern California gangs. Nortenos are members with allegiance to northern California gangs, with the Mason-Dixon gang line being Bakersfield.

Christopher Stoker, Christopher Eakle, and Shanteek Pruitt left Justin Paz's room and went into Kelley Tate's room. Tate heard someone make a phone call and talk of shooting someone. Paz heard Christopher Stoker make a phone call and tell the person on the other end, "[c]ome on in, everything is all good." RP at 210.

At that moment, Christopher Eakle stood in the hallway in front of Kelley Tate's door, but facing Justin Paz's door. With Eakle's attention turned toward Paz, Tate rushed

4

Eakle, knocking him through the wall. Christopher Stoker rescued Eakle, by striking Tate with his brass knuckles. A fight ensued.

When Justin Paz heard the noise outside his room, he jumped from bed. As Paz entered the hallway, Shanteek Pruitt stabbed Paz with a knife seven times. Paz and Pruitt fought, wrestling for control of the knife. As Paz started to control the fight, someone struck him over the head with Paz's electric guitar.

Kelley Tate heard Justin Paz exclaiming, "I'm dying. I'm dying." RP at 37. The thieves fled, and Tate called the police, as Willie Sprayberry told Tate he saw the thieves flee in his brother James' maroon Cadillac.

Around 3:15 a.m., on November 19, Officer Trevor Nollmeyer saw James Sprayberry in his maroon Cadillac and stopped the car. The car transported five other occupants. Officer Nollmeyer pulled Christopher Stoker out of the car and searched him. Nollmeyer found a folding knife clipped to Stoker's belt, and the knife's blade carried dried blood. The Washington State Patrol Crime Lab later identified Justin Paz as the source of that blood. Stoker claims he gave the knife to Shanteek Pruitt earlier in the night to protect herself from rival gang members at the party. After the fight at Tate's home, according to Stoker, Pruitt dropped the knife in his lap.

At jail, Christopher Stoker waived his constitutional rights and told police the altercation resulted from a drug deal gone bad. Stoker explained that his compatriots wished to purchase a pound of marijuana, and an argument and fight erupted over the

5

price of the substance.

On November 21, 2011, police executed a search warrant in James Sprayberry's maroon Cadillac. The law enforcement officers found a gun believed to be used at Kelley Tate's home.

## PROCEDURE

The State charged Christopher Stoker with four crimes: first degree robbery of Justin Paz, first degree robbery of Kelley Tate, first degree burglary of Willie Sprayberry, and first degree assault of Justin Paz. During pretrial motions, the State amended the first degree burglary charge to add Justin Paz and Kelley Tate as victims.

The first degree burglary amended charge read:

> COUNT III: FIRST DEGREE BURGLARY, committed as follows: That the defendant, CHRISTOPHER ALBERT STOKER, as actor or accomplice to another, in the State of Washington, on or about November 19, 2011, with intent to commit a crime against a person or property therein, did enter and remain unlawfully in the building of WILLIE R. SPRAYBERRY, JUSTIN L. PAZ, and KELLEY LEE TATE, located at 2932 E. Ermina, Spokane, Washington, and in entering and while in such building and in immediate flight therefrom, the defendant or another participant in the crime, did assault WILLIE R. SPRAYBERRY, JUSTIN L. PAZ, and KELLEY LEE TATE, a person therein, and the defendant or an accomplice being at said time armed with a firearm under the provisions of 9.94A.602 and 9.94A.510(3), and the defendant or an accomplice being at said time armed with a deadly weapon other than a firearm under the provisions of RCW 9.94A.602 and 9.94A.510(4).

Clerk's Papers (CP) at 147.

Before trial, Christopher Stoker's counsel moved the court to admit testimony relating to Christopher Stoker's gang affiliation. Defense counsel explained his unusual motion to the court:

[Defense Counsel]: I'm seeking this week to offer the testimony of [Officer Michael Roberge] who's commonly offered by the state as an expert on the issue of gang-related—well, a number of issues relating to gangs. The defense theory of this case includes a strong suggestion, if not actual—we think what occurred was primarily gang motivated and we will be offering evidence that there was a misunderstanding and then there was some gang issues that came up that resulted in the assault and a number of the things occurring in the house and that those—those occurrences did not involve Mr. Stoker, that those were primarily motivated by one of the victim's gang ties.

He's been a Sureño since he was a young man. And one of the codefendants—forgive me—Mr. Christopher Eakle, who's been a Norteño for quite some time, I think that those memberships, affiliations, the number of characteristics that come into play based on those allegiances, independent from Mr. Stoker, resulted in some of the things that occurred. And I'm hoping Officer Roberge can help the jury understand how some of those may have—may affect how a person acts under any circumstance and specifically how they may have played out in this case . . . . [T]hose are some of the reasons why I'm hoping to offer his testimony.

[The State]: Your Honor, that's basically correct. I did disclose to Mr. Griffin [defense counsel], but I'll put it on the record so there's no surprises to anyone. In researching the individuals involved in this case, as Mr. Griffin has indicated, one of the victims, Justin Paz, is or was a Sureño gang member from Las Vegas and has a very extensive tattoo to that effect that was visible during this incident because he was awakened during the middle of the night from bed when he had no shirt on.

Mr. Eakle is a very long-time committed Norteño gang member. Shanteek Pruitt, who's an African-American female in the case is a Fourth Street Crip member here in Spokane. The connections of James and Willie Sprayberry are still being looked into by Officer Roberge. We may get further information in that regard. We may not.

And then, finally, we do believe we have an admission by Mr. Stoker of membership in Norteño gangs as well during a prior jail booking

process. Officer Roberge is trying to run down the paper on that and we'll get that to Mr. Griffin as soon as we have it. But Mr. Griffin is aware that that will be an aspect of at least the cross-examination of Officer Roberge.

The Court: Is that right, [defense counsel]?

[Defense counsel]: It is, Your Honor. I learned of that last potential piece of evidence this morning. But certainly I'm offering this. I believe that that would be proper for cross-examination.

The Court: So we're all clear, you're not moving in any way to limit any of that answering evidence in response to your evidence that the state might intend to present; is that correct?

[Defense Counsel]: Not at this point, Judge. Again, I haven't seen it, so once I have a chance to look at it I may have one, but I don't expect it at this point.

The Court: Thank you. So it's fair to say, then, all the gang issues are agreed and stipulated as well; is that right?

[Defense Counsel]: I believe so, yes, Judge.

RP at 14-16.

At trial, Christopher Stoker called Spokane Officer Michael Roberge, a gang expert, to testify. Officer Roberge attested to the animosity between the gangs Norteños, Sureños, and Crips. The animosity, during periods of high tension, can manifest in what is known as a "fight-on-sight rule." RP at 562. When instituted, this rule directs a gang member to fight any rival gang member he sees or be subject to physical violence from his own gang.

After Officer Michael Roberge explained gang culture, defense counsel asked him whether law enforcement knew James Sprayberry, Shanteek Pruitt, Christopher Eakle, or Christopher Stoker to affiliate with particular gangs. Roberge testified that all had gang affiliations. Defense counsel attempted to elicit testimony that the violence towards

8

Justin Paz stemmed from animosity the thieving trio held for Sureños. Roberge could not form an opinion without additional information. On cross-examination, Officer Roberge stated that the reports of someone yelling "this is Norte" during the altercation was a reference to a gang member being a North-sider, or Norteño. RP at 572. According to Officer Roberge, Mr. Stoker has indicated an association with Norteños.

The court instructed the jury on accomplice liability and the elements it must find to return a guilty verdict on each of the four counts: first degree robbery of Justin Paz (count I) and Kelley Tate (count II), first degree burglary (count III), and first degree assault (count IV) or, in the alternative, second degree assault of Justin Paz. The court instructed the jury that it could find Christopher Stoker guilty of first degree burglary if

> He enter[ed] or remain[ed] unlawfully in a building with intent to commit a crime against a person or property therein, and if, in entering or while in the building or in immediate flight therefrom, [he] or an accomplice in the crime is armed with a deadly weapon or assaults any person.

CP at 174.

During closing argument, defense counsel relied on Officer Michael Roberge's testimony to exculpate Christopher Stoker from the violent acts of Shanteek Pruitt and Christopher Eakle. Defense counsel argued Pruitt and Eakle attacked Justin Paz out of animosity towards the Sureños. Rather that aiding Pruitt and Eakle in their gang fueled violence, Stoker tried to discourage them. As an example, counsel emphasized Stoker's questioning of Pruitt and Eakle as they pilfered Paz's room and yelled at them, "What are

9

you doing, What are you doing." RP at 619. Stoker's counsel also highlighted the fact that Stoker told Eakle and Pruitt to return Paz's money.

The jury found Christopher Stoker not guilty of robbing Justin Paz (count I), but guilty of first degree robbery of Kelley Tate (count II), first degree burglary (count III), and second degree, not first degree, assault of Justin Paz (count IV). In addition, the jury found Stoker was armed with a knife and firearm. The court sentenced Stoker to life in prison without the possibility of early release.

In the judgment and sentence report, the court accurately lists the convictions as first degree robbery, first degree burglary, and second degree assault, but later refers to the convictions as counts "1, 2, 3," when Christopher Stoker was convicted of counts 2, 3, and 4. CP at 247, 250.

## LAW AND ANALYSIS

### Insufficient Evidence

Christopher Tate challenges the sufficiency of the evidence underlying his conviction for second degree assault as an accomplice. Due process requires the State to prove, beyond a reasonable doubt, every element of the crime charged. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

When a defendant challenges the sufficiency of the evidence underlying his conviction, he admits the truth of the State's evidence and all inferences that reasonably may be drawn from the evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1069

10

(1992). This court views the evidence in the light most favorable to the State and asks

whether any rational trier of fact could find the essential elements of the crime beyond a

reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980). The

reviewing court considers circumstantial evidence equally reliable as direct evidence.

*State v. Myers*, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997); *State v. Delmarter*, 94 Wn.2d

634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and

cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850

(1990).

> The fact that a trial or appellate court may conclude the evidence is
> not convincing, or may find the evidence hard to reconcile in some of its
> aspects, or may think some evidence appears to refute or negative guilt, or
> to cast doubt thereon, does not justify the court's setting aside the jury's
> verdict.

*State v. Tinajero*, 154 Wn. App. 745, 751, 228 P.3d 1282 (2009) (quoting *State v.

Randecker*, 79 Wn.2d 512, 517-18, 487 P.2d 1295 (1971)) (internal quotation marks

omitted).

The State charged Christopher Tate as an accomplice to the assault against Justin

Paz. To meet its burden, the State needed to establish Stoker knowingly promoted or

facilitated the commission of these crimes (1) by soliciting, commanding, encouraging, or

requesting another person to commit the crimes; or (2) by aiding or agreeing to aid

11

another in the planning or committing of the crimes. RCW 9A.08.020(3)(a);[1] *State v. Knight*, 176 Wn. App. 936, 948, 309 P.3d 776 (2013), *review denied*, 179 Wn.2d 1021 (2014). "A person aids or abets a crime by associating himself with the undertaking, participating in it as in something he desires to bring about and seeking by his action to make it succeed." *Knight*, 176 Wn. App. at 948. *In re Welfare of Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979). Mere presence and knowledge of the criminal activity of another is insufficient. *State v. Sublett*, 176 Wn.2d 58, 80, 292 P.3d 715 (2012). The defendant must be ready to assist in the crime. *State v. Roberts*, 80 Wn. App. 342, 355, 908 P.2d 892 (1996). "An accused who is alleged to be an accomplice to a second degree assault must have known generally that he was facilitating an assault." *State v. McCreven*, 170 Wn. App. 444, 478, 284 P.3d 793 (2012), *review denied*, 176 Wn.2d 1015 (2013).

Christopher Stoker contends he was not aware of any plan to assault Justin Paz, did not facilitate the assault, and actively discouraged Shanteek Pruitt and Christopher Eakle from committing crimes against Paz. His argument requires this court to usurp the jury's role, reweigh the evidence, and overlook the criminal assistance he provided Pruitt and Eakle.

---

[1] The legislature amended RCW 9A.08.020 in 2011. LAWS OF 2011, ch. 336, § 351. These amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

12

Christopher Stoker's own testimony supports his argument that he was not aware of any plan of violence and did not participate in or encourage the violence. The jury, however, was free to discount his testimony and give credence to other testimony. Circumstantial evidence supports the State's theory of the case: that Stoker agreed to invade Tate's home as retribution for embarrassing James Sprayberry. Once inside, Stoker aided in the assault on Paz.

The State presented evidence that Christopher Stoker agreed to help his longtime friend James Sprayberry get revenge against Kelley Tate. Tate testified that he embarrassed James in front of two girls when he took a shotgun away from James and dismissed him. Tate believed James hatched the home invasion to get back at him and to steal rent money. A plethora of evidence corroborates Tate's belief and the State's theory. The thieves entered Tate's home through a basement window at 2:00 a.m. carrying a gun, a knife, and brass knuckles. Inside, they ransacked Tate's room looking for money. Meanwhile, Stoker stood guard. When Pruitt and Eakle moved from Tate's to Paz's room, Stoker called someone, presumably James, and said: "Come on in, everything is all good." RP at 210. The mode of entry, the fact that all three brought weapons, and their actions inside the home support the State's theory of the case.

The thieves' plan to burgle Kelley Tate is not evidence Christopher Stoker agreed to assault Justin Paz. But Stoker's criminal assistance to Shanteek Pruitt and Christopher Eakle is sufficient evidence for a reasonable jury to conclude he facilitated the assault.

13

Stoker admitted he gave Pruitt the knife used to stab Paz. He contends he gave her the knife at a party in case a fight broke out between rival gang members, not in contemplation that she would use it to stab Paz. The jury disagreed and substantial evidence supports its decision. The jury could have concluded from the circumstantial evidence of the plan to assault and steal from Tate, that Stoker gave Pruitt the knife in case their plan to rob Tate went awry. Even if Stoker did not provide the knife in contemplation of stabbing Paz in particular, the jury could have found he generally knew that he was facilitating an assault.

The strongest evidence of Christopher Stoker's assistance in the assault of Justin Paz stems from Stoker's assault of Kelley Tate. Stoker argues he could not have assisted in the assault on Paz because, at the time, he was engaged in a fight with Tate. He is wrong. The fight itself assisted in the assault of Paz. An overt act which aided and assisted others by allowing them to continue their assault on another unimpeded is sufficient evidence to support a second degree assault conviction. *McCreven*, 170 Wn. App. at 479. Paz testified that he got out of bed when he heard Tate shoving Christopher Eakle through the wall. Rather than leaving or stopping the assault, Stoker hit Tate with his brass knuckles. While Stoker fought Tate, Pruitt and Eakle assaulted Paz, stabbing him and hitting him with his electric guitar. Contrary to Stoker's representation that he discouraged the crimes against Paz, he assisted in them.

14

Ineffective Assistance of Counsel

Christopher Stoker argues his trial counsel provided ineffective assistance when he called Officer Michael Roberge to testify. We disagree.

The Sixth Amendment to the United States Constitution guarantees defendants the right to legal counsel in criminal trials. Like the federal constitution, Washington's Constitution also grants an accused, in a criminal prosecution, the right to appear by counsel. CONST. art. 1, § 22. Washington's protections are coextensive with their federal counterpart.

To meaningfully protect an accused's right to counsel, the United States Supreme Court held an accused is entitled to "effective assistance of counsel." *Strickland v. Wash.*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under *Strickland*, courts apply a two-prong test: whether (1) counsel's performance failed to meet a standard of reasonableness, and (2) actual prejudice resulted from counsel's failures. *Strickland*, 466 U.S. at 690-92. To prevail on his or her claim, a defendant must satisfy both prongs of the ineffective assistance of counsel test. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). If a defendant fails to establish one prong of the test, this court need not address the remaining prong. *Hendrickson*, 129 Wn.2d at 78.

To satisfy the first prong, the defendant must show that, after considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The burden is on the

15

defendant to show deficient performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). This court starts with the strong presumption that counsel's representation was effective. *State v. Studd*, 137 Wn.2d 533, 551, 973 P.2d 1049 (1999). To rebut this presumption, a defendant must demonstrate trial counsel's conduct could not be characterized as a legitimate trial strategy or tactic. *Grier*, 171 Wn.2d at 33-34; *Hendrickson*, 129 Wn.2d at 77-78. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores–Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000).

To satisfy the prejudice prong, the defendant must establish that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). In assessing prejudice, "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to the law." *Strickland*, 466 U.S. at 694-95.

Christopher Stoker's trial counsel made a tactical decision to call Officer Michael Roberge. Tactical decisions made by counsel may, but rarely do, serve as a basis for an ineffective assistance claim. *Grier*, 171 Wn.2d at 33. "Deciding whether to call a witness is a matter of legitimate trial tactics that presumptively does not support a claim

16

of ineffective assistance." *State v. Davis*, 174 Wn. App. 623, 639, 300 P.3d 465, *review denied*, 178 Wn.2d 1012 (2013). Before trial, counsel moved to admit evidence of gang affiliation because

> [t]he defense theory of the case includes a strong suggestion . . . [that] what occurred was primarily gang motivated . . . that resulted in the assault and a number of the things occurring in the house and that those occurrences did not involve Mr. Stoker, that those were primarily motivated by one of the victim's gang ties.

RP at 14. Defense counsel's challenged decision was tactical in nature and presumptively does not support Christopher Stoker's claim.

To rebut this presumption, a defendant must demonstrate trial counsel failed to adequately investigate or prepare for trial. *Davis*, 174 Wn. App. at 639. Stoker insists his counsel lacked a strategic reason to present evidence from the gang expert. The testimony harmed him since the expert identified him as a gang member. Stoker contends the expert's testimony conflicted with his own testimony which proves that counsel failed to adequately investigate or prepare for trial.

Christopher Stoker essentially argues his trial counsel's decision was a bad call. He identifies no evidence that counsel would have uncovered had he investigated further nor how such evidence would have changed his counsel's decision. To the contrary, counsel knew of the dangers, particularly since the State and the court warned Stoker's defense counsel of them. The State explained that it would cross-examine Officer Roberge about Stoker's gang ties and anticipated Roberge would testify Stoker was

17

affiliated with the Norteños. Counsel recognized the testimony would be proper for cross-examination and stipulated to it. In retrospect, defense counsel's decision may have been a bad one, but it was a tactical decision that does not support a claim of ineffective assistance of counsel. That a strategy ultimately proves unsuccessful is immaterial to an assessment of defense counsel's initial calculus; hindsight has no place in an ineffective assistance analysis. *See Strickland*, 466 U.S. at 689; *Grier*, 171 Wn.2d at 43. When strong evidence implicates his or her client, sometimes defense counsel must engage in unique strategies that ultimately fail.

Because Christopher Stoker fails to show his counsel's performance was deficient, this court need not address whether counsel's decision prejudiced him.

<u>Information and Jury Instruction / Alternative means</u>

For the first time on appeal, Christopher Stoker challenges the jury instructions and charging document. This court refuses to address issues raised for the first time on appeal unless the appellant raises a manifest error affecting a constitutional right. RAP 2.5(a)(3).

To determine whether an error is truly of constitutional dimension, this court looks to the asserted claim and assesses whether, if correct, it implicates a constitutional interest. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009); *State v. Grimes*, 165 Wn. App. 172, 186, 267 P.3d 454 (2011). Normally, if the alleged error is of constitutional magnitude, this court must determine whether the error was manifest, i.e.,

18

whether it had practical and identifiable consequences at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011); *Grimes*, 165 Wn. App. at 186-87.

When reviewing the sufficiency of an information that is challenged for the first time on appeal, this court engages in a two-pronged analysis. *State v. Kjorsvik*, 117 Wn.2d 93, 105-06, 812 P.2d 86 (1991). First, if the information does not state all elements of the crime, the court determines whether it contains any language, or reasonable inferences, that would give the accused notice of the missing element or elements. *Kjorsvik*, 117 Wn.2d at 106. If there is some language, but it is vague, the court then considers whether the defendant has shown actual prejudice from the defect. *Kjorsvik*, 117 Wn.2d at 106.

The first issue this court confronts is whether Christopher Stoker's challenge is of constitutional magnitude. Stoker argues the court improperly instructed the jury on an alternative means of committing burglary the State did not charge. Because the parties dispute whether the charging document included the alternative means, the propriety of the jury instruction depends on whether the charging document adequately informed the accused of the charges he faced at trial. U.S. CONST. amend. VI; CONST. art. I, § 22 (amend. 10); *State v. Brewczynski*, 173 Wn. App. 541, 548, 294 P.3d 825 (2013). Instructing the jury on an uncharged alternative means violates a defendant's constitutional right to notice of the crime charged, so the claimed error is clearly one of constitutional magnitude. *State v. Jain*, 151 Wn. App. 117, 121, 210 P.3d 1061 (2009).

19

The second issue this court confronts is whether, after liberally construing the language in the charging document, the accused had notice of any allegedly missing elements. *Kjorsvik*, 117 Wn.2d at 106. Christopher Stoker contends the State elected to charge him with committing first degree burglary by assault of a person, not by being armed with a deadly weapon. Stoker contends the to-convict instruction permitted the jury to find him guilty under either means and thus was error.

The State charged Christopher Stoker with, among other crimes:

> COUNT III: FIRST DEGREE BURGLARY, committed as follows: That the defendant, CHRISTOPHER ALBERT STOKER, as actor or accomplice to another, in the State of Washington, on or about November 19, 2011, with intent to commit a crime against a person or property therein, did enter and remain unlawfully in the building of WILLIE R. SPRAYBERRY, JUSTIN L. PAZ, and KELLEY LEE TATE, located at 2932 E. Ermina, Spokane, Washington, and in entering and while in such building and in immediate flight therefrom, the defendant or another participant in the crime, did assault WILLIE R. SPRAYBERRY, JUSTIN L. PAZ, and KELLEY LEE TATE, a person therein, *and the defendant or an accomplice being at said time armed with a firearm under the provisions of 9.94A.602 and 9.94A.510(3). and the defendant or an accomplice being at said time armed with a deadly weapon other than a firearm under the provisions of RCW 9.94A.602 and 9.94A.510(4).*

CP at 147 (emphasis added). The State argues the information charged both alternatives. Stoker argues the information adds firearm and a deadly weapon sentencing enhancements to the substantive charge, but does not add the "armed with a deadly weapon" alternative means to the substantive charge of burglary. The statutory references contained in the information support Stoker's argument. RCW 9.94A.602,

recodified as 9.94A.825 by LAWS OF 2009, ch. 28, § 41, is a deadly weapon enhancement. RCW 9.94A.510 describes the sentencing implications of a deadly weapon enhancement.

Under the liberal construction rule, "even if there is an apparently missing element," this court will uphold the conviction if the missing element can be "fairly implied from the language within the charging document." *Kjorsvik*, 117 Wn.2d at 104. This court looks at the entire information to determine if "the necessary facts appear in any form, or by fair construction can . . . be found, in the charging document." *Kjorsvik*, 117 Wn.2d at 105.

The charging document contains the necessary facts. The charging document states Christopher Stoker was "armed with a firearm" or "a deadly weapon." CP at 147. The fact that the charging document also includes references to sentencing enhancement statutes does not disabuse Stoker of notice. The necessary facts may appear in any form. *Kjorsvik*, 117 Wn.2d at 105. Because the language is vague, Stoker is entitled to reversal if he can show prejudice. *Kjorsvik*, 117 Wn.2d at 105. He cannot since the jury expressly found he was armed with a knife and a gun during the commission of the crime.

Because the charging document gave Stoker adequate notice of the charges he faced and any deficiency did not prejudice him, we reject this assignment of error.

21

Scrivener's Error

The jury found Christopher Stoker guilty of first degree robbery (count II), first degree burglary (count III), and the less-included offense of second degree assault (count IV). The judgment and sentence erroneously refers to these as "Count(s) 1, 2, 3." CP at 247, 250. Both Stoker and the State recognize the presence of a scrivener's errors. The appropriate remedy is remand with an instruction to the trial court to correct the judgment and sentence. *See, e.g., State v. Healy*, 157 Wn. App. 502, 516, 237 P.3d 360 (2010); *State v. Naillieux*, 158 Wn. App. 630, 646, 241 P.3d 1280 (2010).

Statement of Additional Grounds

Christopher Stoker challenges all evidence admitted against him found in the search of James Sprayberry's Cadillac. Stoker argues police illegally searched the car on November 21, 2013, and later obtained a warrant on November 28.

Nothing in the record supports Christopher Stoker's contention. The search warrants are omitted from the record. The charging information states police executed a warrant to search James Sprayberry's Cadillac on November 21, 2011. Sergeant Chester Gilmore and Detective Marvin Hill testified they executed the warrant to search Sprayberry's Cadillac on November 21, 2011. Gilmore testified the search warrant he executed was signed and authorized by a judge. We find no mention of November 28 as the date of the warrant. If Christopher Stoker holds evidence that the warrant police

executed was not signed by a judge, he may expand the record and present his argument in a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

## CONCLUSION

We affirm Christopher Stoker's convictions, but remand for the trial court to correct the scrivener's error contained in the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, C.J.

Lawrence-Berrey, J.

23