# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54242-1-II |
| Respondent, | |
| v. | |
| WARREN DIEGO BLOCKMAN, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. – Warren Blockman met Katrina Mandera on a dating website shortly after Mandera moved to Tacoma. One night when the two of them were together, Blockman got angry when he saw that another man had sent Mandera a text message. Blockman choked Mandera, kicked her in the head, and threatened to kill her friends if she left his residence. Blockman was convicted of felony harassment, unlawful imprisonment, and second degree assault.

Blockman appeals his convictions, arguing that (1) the trial court erred by overruling his objection under GR 37 to one of the State's peremptory challenges; (2) he was denied effective assistance of counsel because Mandera's medical records contained a sentence that was inadmissible hearsay; (3) the trial court's "knowledge" instruction deprived him of due process; (4) the trial court's "threat" instruction violated the First Amendment; and (5) the trial court erred by imposing a community custody supervision fee.

We hold that Blockman's GR 37 argument is waived, that he was not denied effective assistance of counsel, that his challenges to the jury instructions are waived, and that his community custody supervision fee should be stricken based on the State's concession.

Accordingly, we affirm Blockman's convictions but remand to the trial court to strike the supervision fee.

## FACTS

### I. UNDERLYING INCIDENT

Blockman and Mandera met on a dating website about two weeks after Mandera moved to Tacoma. At the time, Blockman was staying with his daughter, Bianca Newton.

One night, Mandera went to Newton's apartment to visit Blockman and stayed overnight. The next day, Blockman's friends were visiting at the apartment, and Mandera made a comment that Blockman "didn't like." 3 Verbatim Report of Proceedings (VRP) at 386. Mandera went to the bathroom to get ready to leave, and Blockman "cornered" her in the bathroom. *Id.* He stood in front of the door and told her that she couldn't leave. Later that night, one of Mandera's male friends texted her around midnight. Blockman saw Mandera's phone light up, took the phone, and began texting the friend pretending to be Mandera.

Mandera tried to get her phone back, and Blockman threw the phone across the room. Blockman then held Mandera down, put one of his hands around her neck, and threatened to kill her. Mandera testified that she could not breathe and that she lost consciousness. When Mandera awoke, Blockman was still texting her friend, and she asked Blockman once again to give her phone back so she could leave. When she sat up, Blockman kicked her in the head. Blockman held Mandera down and told her that she was "not going nowhere" and was "going to stay here." *Id.* at

2

392-93. Blockman told her that if she left, he would go to Mandera's friend's house "and kill everybody." *Id.* at 393.

Mandera believed Blockman's threats, so she stayed at Newton's apartment the entire next day. Newton was also at the apartment all day, but Blockman was not. Blockman told Mandera that she could not leave until he found someone to come pick her up. Blockman eventually texted Mandera that one of his friends was going to meet her outside.

Once outside, Mandera located Blockman's friend and got into her car. Mandera and the friend spent all night together and drove to various places. The following morning, Blockman called Mandera and told her to walk home. After arriving at home, Mandera took herself to the hospital and subsequently made a report with law enforcement.

Blockman was charged with second degree assault, two counts of felony harassment, unlawful imprisonment, and first degree robbery.

## II. JURY SELECTION

During jury selection, both Blockman and one of the jurors expressed concern about the lack of diversity on the venire. Following the State's first peremptory challenge, defense counsel objected under GR 37. Outside the presence of the venire, the trial court stated it was "a bit taken aback" by the objection. 1 VRP at 181. The court noted that the defense was "operating under a presumption, it would seem, that Juror Number 9 is a person of color. And he is not perceptively so to the Court, which really puts [it] in a bit of quandary right here." *Id.*

Defense counsel explained that he asked Blockman, "Does Juror Number 9 look like he's a minority to you? That he's not Caucasian? And he said: Yes." *Id.* at 182. Despite being uncertain that Juror 9 was a person of color, defense counsel objected because he "felt it incumbent upon

[him] to raise that issue on behalf of [Blockman]." *Id.* In response, the State indicated that it did not anticipate a GR 37 challenge because "Juror Number 9 appears to be a Caucasian, white male," and the State did not believe that the issue fell under GR 37. *Id.* The State used a peremptory challenge for Juror 9 because "[h]e didn't seem to be paying attention." *Id.* at 183.

Defense counsel explained that the State's basis for the peremptory was not legitimate "if the Court has felt the first prong of the [GR 37] analysis has been satisfied," meaning that the potential juror "is a member of an ethnic group." *Id.* at 185. The court stated that "this person does not appear to be a person of color," but decided to bring Juror 9 into the court under the guise of individual questioning so that the court could "lay eyes on him." *Id.* at 189. After the individual questioning, the court again stated that "[t]his person, to the Court, is just not a person of color." 2 VRP at 205. The court concluded: "I do not find that an objective observer could view race or ethnicity as a factor in the use of this peremptory challenge because there's nothing noteworthy about the race or ethnicity of this person." *Id.* at 206-07.

### III. TRIAL

*1. Testimony*

Mandera testified to the facts set forth above.

Sharon Lemoine, a nurse practitioner, treated Mandera at Tacoma General Hospital. During Lemoine's testimony, the State offered Mandera's medical records into evidence. Defense counsel did not object to the admission of the medical records, and the records were admitted. Lemoine used the medical records to describe Mandera's injuries and treatment. She explained that Mandera had a hematoma, or swelling, on the side of her head. She also said that "everything

[about Mandera's neck] looked normal, with the exception that there was noted bruising and swelling to the left side of the neck." 3 VRP at 361.

The State asked Lemoine to explain why there was a line in her notes that read, "Status post-assault with choking," even though her initial notes did not include anything about choking. *Id.* at 359. Lemoine explained that sometimes, as patients are being treated, they give more information, and she assumed that "at some point . . . something must have been said" for her to put in her order of the CAT scan of Mandera's neck. *Id.*[1]

On cross examination, Lemoine again stated that she had to "assume something was said" about choking. *Id.* at 365. She also said that if Mandera had told her she had been choked, she would have put it in her initial notes. Defense counsel questioned Lemoine on different aspects of the medical records, including the hematoma on one side of Mandera's head, the bruising on one side of her neck, and that Mandera denied having a loss of consciousness.

*2. Jury Instructions*

The trial court's "Instruction No. 15" defined threat:

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

Clerk's Papers (CP) at 52. Blockman did not object to this instruction.

In addition, "Instruction No. 17" defined knowledge:

> A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he or she is aware of that fact, circumstance, or result.

---

[1] The same note ("Status post assault with choking") appears in the notes by the radiologist who took Mandera's CAT scan. Ex. 19A at 13. Lemoine's notes state elsewhere, "[s]tatus post assault with head injury." *Id.* at 8.

It is not necessary that the person know that the fact, circumstance, or result is defined by law as being unlawful or an element of a crime.

*Id.* at 54. Blockman also did not object to this instruction.

"Instruction No. 20" listed the elements that the State needed to prove beyond a reasonable doubt for the crime of false imprisonment, which included, "(3) [Blockman's restraint of Mandera] was without legal authority;" and "(4) [t]hat with regard to elements (1), (2), and (3), the defendant acted knowingly." *Id.* at 57.

*3. Closing Argument*

During closing, defense counsel argued that the medical records were inconsistent with Mandera's testimony, and that the records do "not corroborate Ms. Mandera's testimony, they seriously call into question its reasonableness, given all the circumstances." 4 VRP at 666. Counsel also argued that the records show no injury to Mandera's neck.

V. Verdict and Sentencing

The jury convicted Blockman on all counts except for first degree robbery.[2]

At the sentencing hearing, the court stated that it was "going to impose only the mandatory sanction that exists, and that's the $500 crime victim penalty assessment." VRP (Jan. 10, 2020) at 15. The court then asked whether the sentence included community custody. The State responded that the second degree assault conviction required 18 months community custody, and the court said, "so be it, 18 months community custody as relates to Count 1." *Id.* at 16. The court did not mention any fees associated with community custody.

---

[2] This included only one count of felony harassment because the other count was dismissed at the close of the State's evidence.

The parties and the court signed Blockman's judgment and sentence. Under the legal financial obligation (LFO) section, the court imposed only the mandatory $500 crime victim assessment. However, the community custody conditions paragraph, on a different page, included a line indicating that the defendant shall "pay supervision fees as determined by [Department of Corrections (DOC)]." CP at 82.

Blockman appeals.

## DISCUSSION

### I. PEREMPTORY CHALLENGE

Blockman argues that the trial court erred by overruling his GR 37 objection. We hold that Blockman has waived this challenge.

### A. GR 37

GR 37 was enacted with the goal of "eliminat[ing] the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). Under the rule, either a party or the court "may object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c). Upon objection, the party that exercised the peremptory challenge at issue must articulate the reasons for which the peremptory challenge was used. GR 37(d). The court must then evaluate the reasons under the totality of the circumstances. GR 37(e). If "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." *Id.* "[T]he question of whether an objective observer could view race or ethnicity as a factor in a peremptory challenge is subject to de novo review." *State v. Listoe*, 15 Wn. App. 2d 308, 321, 475 P.3d 534 (2020).

B. ANALYSIS

Blockman raises a different argument on appeal than he raised at the trial court. In the trial court, Blockman argued that Juror 9 was a member of a racial or ethnic minority, and, therefore, the prosecutor's stated reason for excluding Juror 9 (inattentiveness) was invalid. The trial court explained that Juror 9 did not appear to be a member of a racial or ethnic minority and concluded that an objective observer, therefore, could not have viewed racial bias as a motivating factor in the State's peremptory challenge.

On appeal, Blockman does not renew his argument that Juror 9 was a member of a racial or ethnic minority or that the proposed peremptory strike was based on Juror 9's race or ethnicity, and he does not challenge the trial court's conclusion that an objective observer would have viewed racial bias as a basis for the State's peremptory strike. Rather, Blockman argues that GR 37 does not require the peremptory exclusion of a juror to be based on race or ethnicity. He contends that the prohibition under GR 37(i) against excluding a juror for inattentiveness without first notifying the court and counsel so that such conduct can be verified applies to *all* potential jurors, and thus to *all* peremptory challenges, not just those which are alleged to be based on race or ethnicity. This was not the basis of Blockman's objection below and is raised for the first time on appeal.

We may decline to review issues that were not raised in the trial court. RAP 2.5(a). Blockman does not acknowledge that this argument is brought for the first time on appeal, and he does not argue or attempt to demonstrate that this issue, which is premised on the trial court's alleged violation of a court rule, is a manifest constitutional error which should be considered for the first time on appeal under RAP 2.5(a)(3). "The purpose underlying issue preservation rules is to encourage the efficient use of judicial resources by ensuring that the trial court has the

opportunity to correct any errors, thereby avoiding unnecessary appeals." *State v. Hamilton*, 179 Wn. App. 870, 878, 320 P.3d 142 (2014). *See also State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) ("A party may assign evidentiary error on appeal only on a specific ground made at trial," which gives the trial court the opportunity to cure the error by striking testimony or providing a curative instruction).

Because Blockman did not argue below that the peremptory exclusion of a juror need not be based on race or ethnicity in order to invoke the provisions set forth in GR 37, and does not demonstrate here that the trial court's alleged misapplication of GR 37 should be reviewed for the first time on appeal, the claim is waived.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Blockman argues that he was denied effective assistance of counsel when defense counsel failed to object "to wholesale admission" of Mandera's medical records. Br. of Appellant at 23. We disagree.

### A. LEGAL PRINCIPLES

The right to counsel includes the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To prevail on a claim of ineffective assistance of counsel, a defendant must show "(1) that defense counsel's conduct was deficient . . . and (2) that the deficient performance resulted in prejudice." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

Performance is deficient if it falls below an objective standard of reasonableness based on the record established at trial. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption that a defendant received effective assistance, but this presumption

can be overcome when "there is no conceivable legitimate tactic explaining counsel's performance." *Reichenbach*, 153 Wn.2d at 130. To establish prejudice, the defendant must show that " 'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.' " *Grier*, 171 Wn.2d at 34 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). We need not address both prongs of the test when the defendant's showing on one prong is insufficient. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

B. ANALYSIS

Mandera's medical records included a note saying, "[s]tatus post assault with choking." Ex. 19A at 9. Blockman argues that the reference to choking corroborated Mandera's testimony, which was the only evidence the State presented that Blockman choked Mandera, and that this renders counsel's performance ineffective.

Blockman cannot show prejudice from the admission of the medical records, specifically the line "[s]tatus post assault with choking." Ex. 19A at 9. Blockman must show a reasonable probability that the trial outcome would have been different. *Grier*, 171 Wn.2d at 34. As an initial matter, it is not clear that an objection would have had any effect on the admission of the statement in the medical records. Blockman concedes that the medical records were admissible as business records, but argues that the statement at issue was inadmissible hearsay within hearsay. However, the statement was written by either Lemoine or the radiologist as part of their notes on Mandera's visit. It is not different from other similar statements within the medical records, like "[s]tatus post assault with head injury" Ex. 19A at 8. To the extent that Blockman argues the statement is hearsay

because it came from Mandera, a statement such as this would fall under the hearsay exception for statements made for medical diagnosis and treatment. ER 803(a)(4).

Furthermore, despite Blockman's contention that the only evidence that Blockman choked Mandera, other than "[s]tatus post assault with choking," was Mandera's own testimony, other portions of the medical records and Lemoine's testimony also provided this evidence. For example, Lemoine noted bruising to Mandera's neck in the records. She confirmed this at trial by stating, "everything [about Mandera's neck] looked normal, with the exception that there was noted bruising and swelling to the left side of the neck." 3 VRP at 361. Based on this evidence, and the fact that the note in the records was admissible, Blockman cannot show the requisite prejudice from counsel's failure to object to the admission to the records.

We hold that Blockman was not denied effective assistance of counsel.

### III. JURY INSTRUCTIONS

Blockman argues that two of the court's instructions were constitutional error. We decline to review these claims for the first time on appeal.

#### A. LEGAL PRINCIPLES

We may decline to review claims of error that the defendant did not raise in the trial court. RAP 2.5(a). "Generally, a party who fails to object to jury instructions below waives any claim of instructional error on appeal." *State v. Knight*, 176 Wn. App. 936, 950, 309 P.3d 776 (2013). However, a defendant can raise a "manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a)(3). We do not assume an alleged error is of constitutional magnitude; rather, "[w]e look to the asserted claim and assess whether, if correct, it implicates a constitutional interest

as compared to another form of trial error." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

After determining whether the alleged error is of constitutional magnitude, we look to whether the error is manifest. *Id.* at 99. Error is manifest under RAP 2.5(a) if the appellant can show actual prejudice, demonstrated by a " 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.' " *O'Hara*, 167 Wn.2d at 99 (alteration in original) (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). The defendant bears the burden of demonstrating that the alleged error is both manifest and of constitutional magnitude. *Knight*, 176 Wn. App. at 950-51. Claims raising an error of constitutional magnitude are still subject to a harmless error analysis. *O'Hara*, 167 Wn.2d at 98.

B. KNOWLEDGE INSTRUCTION

Instruction No. 17 stated that, in order for someone to have acted with knowledge, "[i]t is not necessary that the person know that the fact, circumstance, or result is defined by law as being unlawful or an element of a crime." CP at 54. Because Blockman did not object to Instruction No. 17 below, we will review the alleged error in the instruction only if it constitutes a manifest error affecting a constitutional right. *Knight*, 176 Wn. App. at 950-51.

Jury instructions that relieve the State of its burden to prove all elements of a crime beyond a reasonable doubt, or that omit an element of the charged crime, are of sufficient constitutional magnitude to be raised for the first time on appeal. *State v. Weaver*, 198 Wn.2d 459, 465, 496 P.3d 1183 (2021); *O'Hara*, 167 Wn.2d at 103; *State v. Clark-El*, 196 Wn. App. 614, 619, 384 P.3d 627 (2016); *State v. Smith*, 174 Wn. App. 359, 365, 298 P.3d 785 (2013).

Blockman argues that the State was relieved of its burden to prove that Blockman knew he was acting without legal authority because Instruction No. 17 informed the jury that it was not necessary that Blockman "knew any 'fact, circumstance, or result' at issue '[was] defined by law as being unlawful.' " Br. of Appellant at 31 (quoting CP at 54). Blockman does not quote the full sentence in Instruction No. 17, which states, "[i]t is not necessary that the person know that the fact, circumstance, or result is defined by law as being unlawful or an element of a crime." CP at 54. Our supreme court recently addressed this issue in *Weaver* in the context of a to-convict instruction for criminal trespass, which required "that the defendant knew that the entry or remaining was unlawful." *Weaver*, 198 Wn.2d at 467. The knowledge instruction in that case was identical to Instruction No. 17 here, and the issue before the court was whether the knowledge instruction relieved the State of its burden to prove that the defendant knew his entry was unlawful for the criminal trespass charge. *Id.* at 463-64.

The court rejected the argument that Blockman makes here. *Id.* at 469. It explained that the knowledge instruction "is intended to explain that ignorance of the law is no excuse." *Id.* at 467. "Therefore, it is meant to clarify that while it was necessary to demonstrate that Mr. Weaver subjectively knew he was not allowed to be on the property, it is not necessary that Mr. Weaver subjectively knew that his actions constituted a defined crime." *Id.* Similarly, here, the knowledge instruction did not negate or conflict with any element in the to-convict instruction for unlawful imprisonment because Instruction No. 17 merely instructed the jury that it was not necessary that

Blockman knew his actions were "specifically defined in the RCW as an element of" unlawful imprisonment. *See Id.* at 468.[3]

Therefore, Blockman's argument that he was deprived due process because Instruction No. 17 relieved the State of its burden to prove all elements beyond a reasonable doubt fails. Accordingly, no constitutional error occurred and we decline to review this claim for the first time on appeal.

C. THREAT INSTRUCTION

Instruction No. 15 explained that a statement is a threat when "in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk." CP at 52. Once again, Blockman did not object to this instruction below.

Blockman argues that Instruction No. 15 violates the First Amendment. Specifically, he argues that the objective, reasonable person standard in this instruction disregards First Amendment precedent requiring the speaker to intend to communicate an act of violence. This

---

[3] Blockman relies on *State v. Warfield*, 103 Wn. App. 152, 5 P.3d 1280 (2000), to support his contention that the State needed to prove he knew he was acting without legal authority. In doing so, Blockman ignores case law explaining that this is only an essential element where the defendant had a good faith belief that he or she had legal authority to restrain the victim. *See, e.g., State v. Johnson*, 180 Wn.2d 295, 304, 325 P.3d 135 (2014) ("The *Warfield* court's logic does not extend to most unlawful imprisonment cases—particularly those involving domestic violence—where there is no indication that the defendants believed they actually had legal authority to imprison the victim."); *State v. Dillon*, 12 Wn. App. 2d 133, 142, 456 P.3d 1199, *review denied*, 192 Wn.2d 1022 (2020). The to-convict instruction in *Dillon* required the jury to find that the defendant knew that the restraint was without legal authority, which added an unnecessary mens rea requirement that the State was required to prove under the law of the case doctrine. *Dillon*, 12 Wn. App. 2d at 142-43. Regardless, the court held that the defendant's threats toward the victim demonstrated that he "knew he was acting without legal authority." *Id.* at 143.

argument implicates a constitutional interest, but Blockman must still show actual prejudice from this instruction in order to demonstrate this alleged error is manifest. *See O'Hara*, 167 Wn.2d at 98-99.

Blockman acknowledges that our supreme court recently affirmed the objective, reasonable person standard in *State v. Trey M.*, 186 Wn.2d 884, 383 P.3d 474 (2016). In that case, a juvenile defendant sought reversal of convictions for felony harassment. *Trey M.*, 186 Wn.2d at 888. The defendant asked the court to overrule Washington's objective, reasonable person test for true threats. *Id.* at 893. Like Blockman, the defendant asserted that *Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003), required the court to apply a subjective intent standard under the First Amendment. *Id.* at 891. Our supreme court rejected this argument, noting that the "intent to intimidate" element at issue in *Black* was a statutory requirement, "but nothing in *Black* imposes in all cases an 'intent to intimidate' requirement in order to avoid a First Amendment violation." *Id.* at 899-900.

We are bound by the precedent set by the Washington Supreme Court. *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 578, 146 P.3d 423 (2006). Because this constitutional argument has been rejected by our supreme court, Blockman cannot show the requisite prejudice. Accordingly, we hold that Blockman has waived this challenge.

IV. COMMUNITY CUSTODY SUPERVISION FEES

Blockman asks us to order that the community custody supervision fee be stricken from his judgment and sentence, and the State joins in that request. Based on the State's agreement with Blockman on this issue, we remand this matter to the trial court to strike the community custody supervision fee.

A defendant is required to pay the community custody supervision fee unless the court waives the fee. RCW 9.94A.703(2)(d).[4] Because the supervision fee is waivable, it is a discretionary LFO, and it is not error for the trial court to impose the supervision fee despite a defendant's indigent status. *State v. Starr*, 16 Wn. App. 2d 106, 109, 479 P.3d 1209 (2021).

By its concession here, the State, as the proponent of the fee below, is effectively withdrawing its request that Blockman pay this fee as part of his sentence. We grant that request and remand this matter to the trial court to strike the fee.

CONCLUSION

We hold that Blockman's challenge to the trial court's decision not to remove Juror 9 from the venire under GR 37 is waived, and that he was not denied effective assistance of counsel. We decline to review Blockman's challenges to the trial court's "knowledge" instruction and "threat" instruction. Finally, we grant the joint request of the parties to strike the community custody supervision fee.

Accordingly, we affirm Blockman's convictions but remand to the trial court to strike the supervision fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[4] RCW 9.94A.703 was amended in 2018. *See* LAWS OF 2018, ch. 201, § 9004. Because this amendment does not affect our analysis, we cite to the current version of the statute.

CRUSER, J.

We concur:

WORSWICK, J.

GLASGOW, C.J.